# EXHIBIT A



**STATE UNIVERSITY OF NEW YORK**

*Office of the Provost and Senior Vice President*
*for Academic Affairs*

June 11, 2012

Dr. Molly M. Gentleman
Materials Division
Mechanical Engineering Department
Texas A&M University, 3123 TAMU
College Station, TX 77843

Dear Dr. Gentleman:

I am very pleased to offer to you an appointment as Assistant Professor in the Department of Materials Science and Engineering at Stony Brook University. This offer of employment is contingent upon the outcome of the pre-employment background investigation which you authorized in your application for employment. This would be a term appointment to a position of academic rank (tenure track), subject to a collective bargaining unit agreement and to the Policies of the Board of Trustees, which can be viewed at **http://www.suny.edu/Board_of_Trustees/PDF/Policies.pdf**. It would be effective September 1, 2012 and continue through August 31, 2015 at an initial annual salary of $97,000 for services during the academic year, subject to such changes as may be authorized or required by law.

If you wish to accept this appointment, please sign and date the endorsement on the enclosed copy of this letter and return that copy to me as soon as possible. I also enclose a State Employee Statement that must be executed prior to appointment by the University. Your appointment papers will be processed as soon as we receive the completed Statement and enclosed forms.

With the passage of the Immigration Reform and Control Act of 1986, it is necessary for employers to verify employment eligibility for all new employees. The law requires that the employee present documents for identification and for eligibility to work in the United States. Please be prepared to provide these documents prior to the start date of employment at Stony Brook. Federal law requires that these documents be processed within three days of starting employment.

You will soon be receiving an invitation to attend **New Employee Orientation**. The invitation from HRS Training & Organizational Development will include the date, time and location of each session. This required program is presented into two parts. **New Employee Orientation Part I** will run from 9:00 AM – 1:00 PM, and will convey essential information on your health care benefits, employment earnings and resources available to you as an employee. It is critical that you attend on the date you are scheduled as benefit enrollment must be completed within **30 days** of your appointment. Please see attached "Required Proofs" document which you must bring with you to the orientation. **New Employee Orientation Part II** has vital information covering specific University policies and procedures. If you do not receive an invitation to your home address within two weeks of your start date, or have any questions prior to your Orientation, please contact Human Resource Services at 632-4501.

We are delighted at the prospect that you will be joining our faculty.

Sincerely,

Dennis N. Assanis
Provost and Senior Vice President
for Academic Affairs

DNA/jp
Encs.
cc:  Y. Shamash
     M. Dudley

I accept this offer on the terms stated above:

Signature _____

Date _06/20/2012_

MG_0210

 Stony Brook University

**Human Resource Services**
Stony Brook, NY 11794-0751

TEL: 631.632.6161
FAX: 631.632.6168

stonybrook.edu

July 18, 2012

Dr. Molly M Gentleman
1201 Orr Street
College Station, TX 77840

Dear Dr. Gentleman:

Welcome to Stony Brook University!   On behalf of President Samuel L. Stanley Jr., M.D., I am writing to confirm the appointment offered to you by Dennis N. Assanis, Provost and Senior Vice President for Academic Affairs.  This appointment, as described in your letter of offer, is subject to the Policies of the Board of Trustees and to such changes as may be authorized or required by law.

NOTE TO RETIREES:  The New York State Retirement and Social Security Law prohibits the re-hire of state and local government employees while they are receiving pension benefits. There  are  sections  of  the  New  York  State  and  New  York  City  Law and  Code  that  provide  an  exception  to  this  rule  with  salary  limitations  for  both **ordinary or disability** retirees.   Since re-employment can affect your pension benefits, we strongly recommend that you contact your retirement system for guidance.

We are pleased that you have joined us at Stony Brook University and offer our best wishes on your appointment.

Sincerely,

Lynn M. Johnson
Vice President, Human Resource Services

jp

cc:   VP Coordinator
      Personnel File

SUNY

MG_0212

# EXHIBIT B





STATE UNIVERSITY OF NEW YORK

Prof. Michael Dudley, Chair
Department of Materials Science and Engineering
College of Engineering and Applied Sciences
State University of New York at Stony Brook
Stony Brook, New York 11794-2275
631-632-8500      Fax: 631-632-8052
e-mail: michael.dudley@sunysb.edu
URL: http://www.matscieng.sunysb.edu/

July 20, 2015

Professor Molly Gentleman,
Department of Mechanical Engineering,
Texas A&M University 3123 TAMU
College Station TX 77843-3123Hall,
Phone: 979-862-1696
Fax: 979-845-3081
Email: mgentleman@tamu.edu

Dear Professor Gentleman:

I am very pleased to confirm the details regarding our recent discussions concerning the position of tenure track assistant professor in the Dept. of Materials Science & Engineering at Stony Brook University. Appointments to such positions are subject to the Policies of the SUNY Board of Trustees and require approval by the Provost and President. Appointments are also contingent on the outcome of a University-mandated pre-employment background investigation. Once approved, you will be considered a full time employee of the University and as such, you will be eligible for participation in the benefit plans of the University and will be subject to the applicable terms and conditions of employment as spelled out in the contract between New York State (NYS) and United University Professions (UUP).

I will recommend the following terms and conditions of your appointment effective, September 1, 2012.

**Rank:** Tenure track assistant professor.

**Salary:** $97,000 for 9 month academic year obligation.

As a supplement to your academic year salary you may apply for up to 3 months (3/9) of summer salary subject to University policies, approval by the funding sponsor and availability of funds. Summer salary in excess of 2.5 months will require a written statement from you verifying you have not taken any vacation during the academic year and will not take any vacation during the summer period. The summer salary rate is based on your full time academic year salary.

**Start-up:** To initiate your research program, your start-up package will be comprised of the following contributions:

- A $300,000 Equipment fund primarily to provide a specialized Raman microscope and peripherals.

- For your first two years, one month of summer salary will be provided by the Dean of CEAS and another month by the Dept. of Materials Science & Engineering.

- In addition, the Dept. of Materials Science and Engineering will provide one graduate student TA line and tuition waivers for a period of 2 years (support of these TA's during the summer is also provided for this two year period). The Dean of CEAS will also provide 1 TA line for two years. All TA lines include tuition waivers.

- The Deans of CEAS will provide you with travel support up to $1500 per year for two years. The Dept. of Materials Science Engineering will provide travel funds for your students of up to $1000 per year for two years.

MG_0146



- The Center for Thermal Spray Research (CTSR) will provide you with summer support of 0.5 m/year for 3 years. It will also allow you access to CTSR facilities up to a value of $15,000/year for 2 years. CTSR will also provide student support in the form of 1GA line in year 3 to work on the NSF PFI program.

- The University will provide a standard moving allowance of $3,000.

- The University will also cover space renovation costs of up to $30,000.

**Teaching Obligation:** As a faculty member in the Dept. of Materials Science and Engineering you will have a standard teaching load (typically 3 courses per year). This requirement will be waived for the first semester of your appointment.

If the above terms and conditions are acceptable to you, please acknowledge by signing below and returning this letter to me.  The second copy is for your records.

We are most enthusiastic about having you join the Stony Brook community, and our faculty looks forward to working with you as a colleague.  I would be happy to talk with you further about any questions or issues you have regarding the position.

Sincerely,

Prof. Michael Dudley
Chair, Dept. of Materials Science & Engineering

Acknowledged:

Prof. Molly Gentleman

Signature                              Date

MG_0147

# EXHIBIT C

**Stony Brook University**

## New Employee Orientation Checklist - Certification of Receipt
## Policies and Procedures
## (State Faculty/Professional/State Classified/Management Confidential Employees)

As an employee of the State University of New York at Stony Brook you are entitled to receive information about the terms and conditions of your employment, including the University policies and procedures that affect your working conditions. This information is referenced on the following list, is available on request during your Orientation program and is located online at: http://www.stonybrook.edu/policy/

Below, please sign and date this certification of receipt to acknowledge your access to these policies.

## Policies/Procedures

| | |
|---|---|
| P100 Policy Development and Revision | P505 Tuition Benefits for Employees |
| P101 Related Corporations/Organizations | P506A Disbursement of non Payroll Checks |
| P102 Notices in University Publications | P506B Disbursement of State Paychecks/Advices |
| P103 University Seal | P507R Student Access to Academic Records |
| P104 Use of University Stationary | P508 Financial Transactions with Students |
| P105 Equal Opportunity/Affirmative Action | P510 Use of University Name or Logo |
| P106 Sexual Harassment | P511 Financial Obligations of Students |
| P107 Public Assembly | P512 Duplication of Material Protected by Copyright |
| P108 Substance Abuse | P513 State Paycheck Modification: for Employee Change in Status |
| P109 Use of Information Technology | P514 Military Leave for Employees |
| P110 Employee Training and Development | P515 Authorized Signatures for Fiscal Transactions |
| P111 Audits of Campus Financial Activities | P516 Driver's License Verification |
| P112 Smoke Free University | P517 Use of Campus Facilities |
| P112A Research and Development Park Smoke-Free University | P518 Family Medical Leave Act (FMLA) |
| P113 Policy on Use of Campus Cable Television System | P519 Workplace Violence |
| P114 Marketing of Credit Cards to Students | P520 Domestic Violence and The Workplace Policy |
| P115 SUSB HIPAA Information and Communication Infrastructure Security and Private Policy | P521 Disruptive Behavior Policy |
| P116 Criminal Background Check Policy | P522 Right to Express Breast Milk in the Workplace |
| P117 University Bank Account Policy | P600 Guns on Campus |
| P118 West Campus/HSC on call/Recall Policy | P601 Guests/Visitors: Use of Facilities & Programs |
| P122 Service of Alcohol on University Premises | P602 Equipment Inventory Control |
| P200 Library Loan and Access Privilege | P606 Skateboarding and Roller Skating/Rollerblading |
| P202 Research Involving Human Subjects | P607 Abandoned Vehicle Policy |
| P203 Use of Staller Center for the Arts | P608 Temporary Visitor Restriction |
| P204 Activities Involving Use of Vertebrate Animals | P609 Environmental, Health & Safety |
| P205 Tours of the Division of Laboratory Animal Resources | P610 Special Service Permits |
| P206 Use of Controlled Substances in Research and Instructional Activities | P611 Control of Keys, Locks and Other Security Devices for Campus Facilities |
| P207 Submission of Grades | P612 Sign Standards and Management |
| P208 Relationships Between University Staff and Students | P613 State Funded and Sole Source Procurement |
| P209 Investigator Financial Disclosure Policy (Conflict of Interest) | P614 University Purchasing & Contracts Administration |
| P210 Scholarly Misconduct Policy | P615 Posting Information: Posters/Flyers University Wide |
| P501 Freedom of Information Law | P616 Minors Working with Hazardous Materials in Research Lab |
| P502 Appointments to Professional Positions on an Acting Basis | P700 Fund Raising and Solicitation on Campus |
| P503 Cash Advance Against Payroll | |
| P504 University Travel Policy | |

I certify that I am able to access a copy of the above-listed polices from the Stony Brook University website and/or that I received a booklet containing this information during my orientation program.

*Molly Gentleman*                                    09/17/12

Employee Name (Please Print)                          Date

*[signature]*

Employee Signature

MG-95

# EXHIBIT D

 **Stony Brook University**

**Office of the President**
Stony Brook, NY 11794-0701

TEL: 631.632.6265
FAX: 631.632.6621

stonybrook.edu

## MEMORANDUM

**TO:** Members of the Stony Brook University Community

**FROM:** Samuel L. Stanley Jr., MD
President

**DATE:** October 1, 2014

**RE:** Notice of Stony Brook University's Policies on Non-Discrimination,
Sexual Harassment, Non-Consensual Sexual Contact, Domestic and
Dating Violence, and Stalking

All universities, especially public institutions, have a responsibility to provide
leadership regarding the conduct of its employees and students. Stony Brook
University (including Stony Brook Medicine, Long Island State Veterans Home,
and all other Stony Brook University facilities and programs) has a longstanding
commitment to equal employment and educational opportunity, and
environments that foster respect, dignity, fairness, and equity. The community
includes, but is not limited to, employees, students, visitors, guests, contractors,
and vendors associated with Stony Brook University. Stony Brook University is
committed to creating and maintaining workplace, educational, and recreational
environments that are safe and accessible, and free of all forms of discrimination,
discriminatory harassment and sexual harassment, including non-consensual
sexual contact, sexual violence, domestic violence, dating violence, and stalking.

Stony Brook University, as required by law must be in compliance with the *Civil
Rights Act of 1964* (Title VII), as amended, Title IX of the *Education Amendments
of 1972*, *Rehabilitation Act of 1973*, *Age Discrimination in Employment Act*
(ADEA), *Americans with Disabilities Act* (ADA), and *New York State Human
Rights Law*, including other applicable statutes and limitations. These prohibit
discrimination and harassment on the bases of race, sex, sexual orientation,
gender identity, religion, age, color, creed, national or ethnic origin, disability,

MG_0189

marital status, genetic information, criminal conviction, domestic violence victim status, veteran status and/or military status in the administration of its policies, programs, activities, or other University administered programs or employment. This includes the terms, conditions, and privileges of employment and access for students, faculty, and staff. Stony Brook University's non-discrimination policy affects all employment practices including, but not limited to, recruiting, hiring, transfers, promotions, benefits, compensation, training, educational opportunities, and terminations. Also, no one shall be subject to retaliation for instigating or participating in a complaint process.

Stony Brook University prohibits sexual harassment, which consists of unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when:

- submission to such conduct is made, either explicitly or implicitly, a term or condition of an individual's employment or academic advancement;
- submission to, or rejection of such conduct by an individual is used as the basis for employment or academic decisions affecting such individual;
- such conduct has the purpose or effect of unreasonably interfering with an individual's work or academic performance, or creating an intimidating, hostile, or offensive working, living, or academic environment; and/or
- physical sexual contact occurs without consent.

These policies are important to creating and maintaining a community in which a diverse population can live, work, study, and recreate in an atmosphere of tolerance, civility, equity, equal employment opportunity, and respect for every individual. Stony Brook University's administration, faculty, staff, and students are each responsible for helping to create and maintain welcoming environments. Prohibited conduct, if allowed, would impede the institution's mission to provide an education of distinction in a dignified and respectful learning and employment environment.

Stony Brook University is responsible for and fully committed to the prevention and elimination of all forms of discrimination and harassment, and, by this notice, hereby, reminds the Provost, Deans, Department Chairs, Vice Presidents, Directors, Administrators, Managers and Supervisors that they are responsible for promoting an atmosphere free of such unacceptable conduct. All employees, students and members of the Stony Brook University community, are encouraged to promptly report prohibited conduct to the Office of Diversity and Affirmative Action (ODAA) or the Office of Civil Rights. To file such a report, make inquiries,

MG_0190

file a complaint with the University or an external governmental office, seek referrals to health services for victims of sexual violence, please contact:

- Office of Diversity and Affirmative Action (ODAA), 201 Administration Building, Stony Brook University, Stony Brook, NY 11794-0251 (631-632-6280 or visit http://www.stonybrook.edu/diversity/;
- Stony Brook University Title IX Coordinator, Marjolie Leonard, Director for Title IX and Risk Management, 201 Administration Building, Stony Brook, NY 11794-0251 (631-632-6280);
- Stony Brook University Police Department, 175 Dutchess Hall, Stony Brook, NY 11794-5501 (631-632-6350). For 24-hour Emergency Services or to report suspected criminal activity, call 911 or 333 from any campus phone, or 631-632-3333.

Questions about this policy notice can be directed to Marjolie Leonard or ODAA, above.

MG_0191

 **Stony Brook University**

**Office of the President**
Stony Brook, NY 11794-0701

TEL: 631.632.6265
FAX: 631.632.6621

stonybrook.edu

## MEMORANDUM

**TO:**       Members of the Stony Brook University Community

**FROM:**   Samuel L. Stanley Jr., MD
                 President

**DATE:**    October 1, 2014

**RE:**        Notice of Stony Brook University's Policy on Equal Employment
                 Opportunity and Affirmative Action

Stony Brook University (including Stony Brook Medicine, Long Island State Veterans Home, and all other Stony Brook University facilities and programs) has a longstanding commitment to equal employment and educational opportunity, and environments that foster respect, dignity, fairness, and equity. The Stony Brook University community includes, but is not limited to employees, students, visitors, guests, contractors, and vendors associated with the institution. Stony Brook University is committed to creating and maintaining workplace, educational, and recreational environments that are safe and accessible, and free of all forms of discrimination, discriminatory harassment, and sexual harassment, including non-consensual sexual contact, sexual violence, domestic violence, dating violence, and stalking.

Stony Brook University, as required by, and in compliance with the Civil Rights Act of 1964 (Title VII), as amended, Title IX of the Education Amendments of 1972, Rehabilitation Act of 1973, Age Discrimination in Employment Act (ADEA), Americans with Disabilities Act (ADA), and New York State Human Rights Law, including other applicable statutes and regulations, is an equal opportunity employer committed to providing equal opportunity in education, employment, membership, and contracts.

MG_0192

Stony Brook University prohibits discrimination on the basis of race, sex, sexual orientation, gender identity, religion, age, color, creed, national or ethnic origin, disability, marital status, genetic information, criminal conviction, domestic violence victim status, veteran status and/or military status in the administration of its policies, programs, activities, or other Stony Brook University administered programs or employment, and includes the terms, conditions, and privileges of employment and/or access for students, faculty, and staff. Stony Brook University's non-discrimination policy affects all employment practices including, but not limited to, recruiting, hiring, transfers, promotions, benefits, compensation, training, educational opportunities, discipline, and terminations. Also, no one shall be subjected to retaliation for initiating or participating in a complaint process.

Stony Brook University is committed to take Affirmative Action consistent with federal and state law in the employment and advancement of American Indians or Alaska Natives, Asians, Blacks or African Americans, Hispanic or Latinos, Native Hawaiians or Other Pacific Islanders, individuals with disabilities, disabled veterans, recently separated veterans, Armed forces service medal veterans, active duty wartime or campaign badge veterans and other protected veterans, where underrepresentation in the workforce exists. Stony Brook University will make good faith efforts consistent with federal and state law to decrease underrepresentation and review progress on an annual basis.

Stony Brook University is responsible for ensuring that its Equal Employment Opportunity/Affirmative Action (EEO/AA) Policy is administered effectively. The Office of Diversity and Affirmative Action (ODAA) is charged with the responsibility of monitoring the EEO/AA program and policies. The Provost, Deans, Department Chairs, Vice Presidents, Directors, Administrators, Managers, and Supervisors are responsible for ensuring that their respective unit meets its EEO/AA obligations. Each Stony Brook University College and Division will be evaluated annually on progress toward goal achievement.

ODAA is responsible for overseeing the daily activities of the University's EEO/AA programs and developing the Stony Brook University Affirmative Action Plan. Marjolie Leonard, Director for Title IX and Risk Management and ODAA may be contacted at 201 Administration Building, Stony Brook University, Stony Brook, NY 11794-0251, (631) 632-6280, Marjolie Leonard@stonybrook.edu. (http://www.stonybrook.edu/diversity/).

# HEAR IT.  SEE IT.
# ☑REPORT IT.

## Report all incidents of discrimination, discriminatory harassment, sexual harassment, non-consensual sexual contact, domestic violence, stalking and sexual violence.

All such incidents of discrimination are taken seriously at Stony Brook University. As required by state and/or federal law, discrimination and harassment on the basis of race, sex, sexual orientation, gender identity, religion, age, color, creed, national or ethnic origin, disability, marital status, genetic information, criminal conviction, domestic violence victim status and military status are prohibited. The Office of Diversity and Affirmative Action will investigate all reported incidents, as appropriate, or refer them to another Stony Brook University office for a response.

### TO FILE REPORTS:

**Office of Diversity and Affirmative Action (ODAA)**
Administration Building, Room 201
(631) 632-6280
email: odaa@stonybrook.edu

**Title IX Coordinator – Marjolie Leonard**
Administration Building, Room 201
(631) 632-6280
email: titleix@stonybrook.edu

**University Community Standards**
Administration Building, Room 347
(631) 632-6705
email: communitystandards@stonybrook.edu

**Southampton Campus Contact**
Sean Pierce, Director of Student Life
(631) 632-5115
sean.pierce@stonybrook.edu

**Employee and Labor Relations**
West Campus and Health Sciences
Administration Building, Room 291A
(631) 632-6140

East Campus/Hospital (Health Sciences Tower)
Level 3, Room 3-040
(631) 444-3780

Long Island State Veterans Home (LISVH)
100 Patriots Road, Stony Brook, NY 11790
(631) 444-8617

**University Police Department**
175 Dutchess Hall, Front Desk
(631) 632-3333 or
333 from a campus phone

### FOR COUNSELING AND PSYCHOLOGICAL SERVICES:

**Student Health Services Building**
2nd floor
(631) 632-6720

**Health Sciences Tower**
Level 3, Room 3-040F
(631) 444-7760 or (631) 444-7724

**VIBS (Victims Family Violence and Rape Crisis Center)**
24-hour hotline: (631) 360-3606
website: vibs.org
email: hotline@vibs.org

**Employee Assistance Program (EAP)**
Frank E. Melville Jr. Memorial Library, W-0505
(631) 632-6085
email: eap@stonybrook.edu

### FOR MEDICAL AND PSYCHIATRIC SERVICES:

**University Hospital and Stony Brook Medicine**
Sexual Assault Nurse Examiner (SANE) Center
101 Nicolls Rd., Stony Brook, NY 11794

Sexual Assault Nurse Examiner (SANE) Center,
Peconic Bay Medical Center
1300 Roanoke Ave., Riverhead, NY 11901
(631) 548-6000

Emergency Medicine
(631) 444-2499

Medical Center Switchboard
(631) 689-8333
(631) 632-6085

---

Please visit *stonybrook.edu/diversity* for information on filing reports with
state and federal offices, relevant SBU policies, online training and other resources.

**For 24-hour Emergency Services or to Report Suspected Criminal Activity
Call University Police: 333 (on campus)
(631) 632-3333 (off campus or from a cell phone)**

175 Dutchess Hall – SBU South Campus
(accessible via Marburger Drive and SBU Outer Loop Bus)

---

 Stony Brook University

Stony Brook University/SUNY is an equal opportunity, affirmative action employer and educator.
For a disability-related accommodation, please call the Department of Human Resources at
(631) 632-6161 or the University Hospital Department of Human Resources at (631) 444-4700.

MG_0194

# COMPLAINT PROCEDURE FOR ALLEGATIONS OF DISCRIMINATION

*Office of Diversity and Affirmative Action*
*Updated March of 2014*



**Stony Brook University**

1

MG_0195

## *Complaint Procedure for Allegations of*
## *of Discrimination[1]*

### *Statement of Principles*

Stony Brook University (including Stony Brook Medicine, Long Island State Veterans Home, and all other Stony Brook University facilities and programs), referred to as "Stony Brook" or the "University," has a longstanding commitment to equal employment and educational opportunity, and environments that foster respect, dignity, fairness, and equity. Stony Brook is committed to creating and maintaining workplace, educational, and recreational environments that are safe and accessible, and free of all forms of discrimination.

In continuing Stony Brook's effort to seek equity in education and employment, and consistent with Federal and State anti-discrimination legislation, the University has adopted a complaint procedure for the prompt and effective investigation of allegations of discrimination on the basis of race, color, creed, national or ethnic origin, religion, age, sex, sexual orientation, gender identity, disability, military status, genetic information, criminal conviction, domestic violence victim status, and/or marital status. Harassment on the basis of any of the above-protected categories is discriminatory harassment and is a form of discrimination. Stony Brook shall make reasonable efforts to investigate and address instances of discrimination of which it becomes aware, even in the absence of a complaint or complainant cooperation.

### *Applicability of Procedure*

This procedure applies to all complaints alleging discrimination, which include sexual harassment, sexual assault and sexual violence, against employees, students or third parties.[2] This procedure is intended to balance the rights of those bringing complaints of discrimination (the "Complainant") with those against whom such claims are brought (the "Respondent"). Throughout these procedures, the "parties" shall refer to the Complainant and the Respondent involved in the complaint.

---

[1] This document is provided for informational purposes only. It is not intended to be interpreted or relied upon as legal advice. Anyone seeking or requiring legal advice should consult an attorney.
[2] A third party refers to anyone outside the University community, including but not limited to, guests, visitors, vendors, and volunteers.

2

MG_0196

This procedure may be utilized if the Complainant or Respondent is a Stony Brook student, employee or third party, if the alleged incident(s) took place at a University facility, program, or activity. Employee grievance procedures established through negotiated contracts, academic grievance review committees, student disciplinary grievance boards, and any other procedures defined by contract will continue to operate as before.

*External Agencies*

This procedure does not deprive a Complainant of the right to file a complaint with outside enforcement agencies, such as the New York State Division of Human Rights, the United States Equal Employment Opportunity Commission, the Office for Civil Rights of the United States Department of Education and the Office of Federal Contract Compliance of the United States Department of Labor. A Complainant may file a charge of discrimination with the appropriate state and/or federal enforcement agencies at any point in the process, subject to applicable time limitations. It is important to note that filing an internal complaint pursuant to this procedure does not extend the time limits established by state and federal enforcement agencies. A list of state and federal enforcement agencies are listed in *Appendix A*.

Upon filing with an external agency, the Stony Brook internal complaint may be referred to the Office of General Counsel for review, defense or, if deemed appropriate, mediation, conciliation, or settlement with the external agency, or such other actions as may be in the interests of the University, including the termination of the internal process.

## Jurisdiction of the Office of Diversity and Affirmative Action is not Exclusive

The University will investigate alleged acts of discrimination of which it becomes aware. Based on information received by the Office of Diversity and Affirmative Action (referred to as "ODAA"), the ODAA Director or designee may exercise his/her own discretion and initiate an investigation in the absence of a complaint. Depending on the circumstances, allegations of discrimination may also be referred to and/or investigated by ODAA and other University offices, including Employee and Labor Relations ("Labor Relations") and Student Affairs.

If at any time during the course of investigating a complaint the ODAA Director or designee determines that a complaint is not within the jurisdiction of the office, the complaint and the Complainant shall be referred to the appropriate office and the matter shall be considered concluded by ODAA. The ODAA Director or designee may determine that a specific complaint is of such a serious nature that the matter must be referred immediately to the appropriate University office. The University Police Department may also become involved if criminal conduct is implicated.

3

MG_0197

## *The Following Should be Reported to ODAA for Investigation*

### *Discrimination*

All alleged violations of Stony Brook policy, which prohibits discrimination on the basis of race, color, creed, national or ethnic origin, religion, age, sex, sexual orientation, gender identity, disability, military status, genetic information, criminal conviction, domestic violence victim status, and/or marital status, should be reported for investigation.

### *Discriminatory Harassment*

Discriminatory harassment is a form of discrimination, which is prohibited and should be reported. Discriminatory harassment is improper conduct toward a particular individual, individuals, or groups on the basis of one or more of the categories indicated above, which is sufficiently severe or pervasive that it has the purpose and/or effect of:

- Creating an intimidating, hostile, or offensive work or educational environment for individuals and/or groups; or

- Unreasonably interfering with the work, academic performance, living environment, personal security, or participation in any University-sponsored activity of individuals and/or groups.

### *Sexual Harassment*

Sexual harassment is a form of discrimination based on sex, which is prohibited and should be reported. Sexual harassment encompasses unwelcome, gender-based verbal or physical conduct, such as unwelcome sexual advances, unwelcome requests for sexual favors, requests for sexual favors in exchange for some benefit, and/or unwelcome verbal or physical conduct of a sexual nature. Sexual harassment occurs when:

- Submission to such conduct is made either explicitly or implicitly a term or condition of any individual's employment or education; or

- Submission to or rejection of such behavior by an individual is used as the basis for employment or educational decisions affecting the individual; or

- A behavior is sufficiently severe, persistent or pervasive to interfere with an individual's work or educational performance, or creates an intimidating, hostile, or offensive work or educational environment.

Examples of behaviors that may rise to the level of sexual harassment include, but are not limited to, the following:

- Physical assault;

- Direct or implied threats that submission to sexual advances will be a condition of employment, work status, promotion, grades, work references, or letters of recommendation; and

MG_0198

- A pattern of behavior that is unwelcome, and severe or pervasive, resulting in unreasonable interference with the work, educational or recreational environment or the creation of a hostile, intimidating or offensive work, educational or recreational environment, may include, but is not limited to the following:
    - Comments of a sexual nature;
    - Sexually explicit statements, questions, jokes, or anecdotes;
    - Unnecessary or undesirable touching, patting, hugging, kissing, or brushing against an individual's body;
    - Remarks of a sexual nature about an individual's clothing, body, or speculations about sexual experiences;
    - Persistent, unwanted attempts to change a professional relationship to an amorous relationship;
    - Subtle propositions for sexual activity or direct propositions of a sexual nature;
    - Uninvited letters, e-mail messages, text messages, telephone calls, or other correspondence referring to or depicting sexual activities; and/or
    - Any of the above carried out via social media.

*Sexual Assault*

Sexual assault is defined as a physical sexual act or acts committed against a person without their consent. Sexual assault is an extreme form of sexual harassment. Sexual assault includes what is commonly known as "rape," whether forcible or non-forcible, "date rape" and "acquaintance rape."

*Sexual Violence*

Sexual violence is defined as any other form of a physical sexual act perpetrated against an individual without their consent or when a person is incapable of giving consent.

## Title IX Complaints

All individuals reporting acts of sex discrimination, sexual harassment, or sexual violence will be informed by ODAA of their options and resources, consistent with Title IX – a federal statute that prohibits discrimination on the basis of sex. Complainants will be provided a list of available resources, including counseling, local rape crisis center information, medical services, police services, and state and/or federal agencies for the filing of external complaints. Complainants will also be advised of their right to file a complaint with local law enforcement agencies.

5

MG_0199

Stony Brook will comply with law enforcement requests for cooperation, which may require the ODAA and other University offices to temporarily suspend the fact-finding aspect of a Title IX-related investigation while the law enforcement agency is in the process of gathering evidence. Stony Brook will promptly resume its investigation as soon as notified by the law enforcement agency that it is completed the evidence gathering process. As necessary, Stony Brook will implement appropriate interim steps during the law enforcement agency's investigation to provide for the safety of the Complainant and the University community, and to avoid retaliation.

ODAA staff may explain the availability of interim measures during its investigation, as appropriate. In the case of an investigation of possible sexual harassment, Complainants may be informed as to where to obtain counseling, psychological, medical and/or psychiatric services. Student Complainants may be informed about interim measures that can be taken if the Respondent lives on campus and/or attends classes with the Complainant. ODAA staff will explain that such measures should not disproportionately affect the Complainant and he/she should be referred to Student Affairs for assistance with making such arrangements.

## *Role of the Staff of the Office of Diversity and Affirmative Action*

The ODAA is a neutral fact-finding office. Professional staff members are trained in investigating complaints and are available to assist with filing a complaint. Investigations will be conducted in a prompt and effective manner. Both parties will have the opportunity to offer evidence to be considered. ODAA does not represent either party, but does advocate on behalf of the University's principles of equal opportunity, nondiscrimination and equity.

The ODAA and its Director report to the University's Title IX Coordinator, who is also the Senior Director for Title IX and Risk Management (referred to as the "Title IX Coordinator"), and reports directly to the University President. The Title IX Coordinator may participate in ODAA functions, which are set forth in this procedure. The Title IX Coordinator may be contacted at:

Office of the President
Stony Brook University
310 Administration Building
Stony Brook, NY 11794-0701
Phone: 631-632-6975

MG_0200

*Conflict of Interest*

The ODAA shall receive any information concerning any factors that could prejudice an objective evaluation of the evidence. In the event that a conflict of interest arises, the University will take necessary measures to ensure that the investigation is thorough and impartial. These measures may include reassignment of the investigation to other investigators with appropriate experience and training. If a staff member of ODAA or the Title IX Coordinator is the Respondent, the matter may be referred to the President or his/her designee. If the President is the Respondent, the ODAA will refer the complaint to the Office of General Counsel.

*Confidentiality*

The ODAA staff will conduct its investigation in a confidential manner to the extent practicable and/or permitted by law. Note, however, that the ODAA's fact-finding may also be utilized by other offices, including Labor Relations (as consistent with the collective bargaining agreements). The parties and witnesses are expected to cooperate fully in the investigation, and maintain and preserve the confidentiality of the investigation.

## Filing a Complaint

The ODAA staff may receive complaints from students, employees or third parties, and inquiries, reports, and requests for consultation and counseling. A complaint may be filed with either the ODAA or the Title IX Coordinator (see page 12 for contact information). ODAA staff should be consulted to discuss the viability of pursuing a complaint against a third party. This procedure assumes that a written complaint will be submitted. However, complaints may be filed orally.

*Time frame*

Ordinarily, complaints should be filed within ninety (90) days after the last act of alleged discrimination occurred. In instances involving a student complaint against a faculty member charging discrimination that occurred in the context of a subordinate-supervisor academic relationship (e.g., teaching, advising, thesis or dissertation supervision, coaching, clinical medical supervision), the time period may be extended until ninety (90) days after the student is no longer under the faculty member's academic or clinical medical supervision.

*Supervisory Responsibility*

Complaints or concerns that are reported to or act(s)/conduct that is observed by an administrator, manager or supervisor involving an alleged act of discrimination, should

7

be promptly referred to either the ODAA or the Title IX Coordinator for appropriate action. All other employees are also encouraged to make such reports to their supervisor, the ODAA or the Title IX Coordinator.

## Retaliation

Retaliation against an employee, student or any witness who participates in an ODAA investigation pursuant to this procedure is prohibited. Retaliation is also prohibited against any individual who files a sex discrimination complaint under Title IX or participates in a complaint investigation in any way. Any substantiated act of retaliation may result in sanctions or other disciplinary action as covered by collective bargaining agreements, and/or applicable University policies.

## Procedures for Investigating Complaints

### Complaint Consultation & Review
The length of time for the consultation will vary depending on factors such as the complexity of the situation, office workload, or whether the situation involves actual or imminent loss of employment or academic standing, potential physical harm, or an ongoing relationship between the parties. In a telephone conversation or in-person appointment, a staff member will:
- Receive complaints of alleged discrimination;
- Discuss the facts of a situation and help the individual identify the problem(s);
- Assist the Complainant in the use of the Complaint Intake Form;
- Determine if the ODAA is the appropriate University office to address the allegation(s);
- Inform the individual of the ways in which the ODAA approaches its investigative processes;
- Advise an individual of alternate available University resources and external options; and
- Provide the Complainant with information about the various internal and external mechanisms with which the complaint may be filed.

### Expectations
The University's review procedures are not designed to replicate an external judicial process. Consequently:
- Complainants and Respondents are expected to meet with ODAA staff as needed and requested;

8

MG_0202

- During any portion of the procedures, the parties shall be prohibited from using audio or videotaping devices;
- Advocates and representatives of a Complainant or a Respondent may not participate at any meeting convened by ODAA;
- Respondents and Complainants are expected to communicate with ODAA directly, not through legal counsel, other intermediaries, or persons accompanying the parties;
- The ODAA may provide the parties with periodic updates, as deemed appropriate and/or necessary;
- As appropriate, the ODAA will provide the parties with written notice of whether the complaint has been substantiated.

*Intake Interview*

The ODAA staff will ask a Complainant to participate in an initial intake interview, in which the Complainant will be:

- Asked to complete a Complaint Intake Form (the Complainant may be asked to have this completed prior to the intake interview) (see Appendix B);
- Interviewed so that the allegations may be clearly stated;
- Asked to provide information about witnesses and other possibly aggrieved persons;
- Advised of ODAA's investigative procedures;
- Referred to another University office if the complaint does not fall within ODAA's jurisdiction;
- Advised of the University's policy against retaliation;
- Advised of the extent to which ODAA can maintain confidentiality in the investigative process; and
- Advised of the option to file a complaint with external federal and/or state investigative agencies at any time.

*After the Intake Interview*

The ODAA staff will determine whether a complaint merits further review. If it is determined that an investigation is necessary, the ODAA will commence the investigation in a prompt and effective manner, pursuant to the jurisdiction requirements outlined above. An investigation is started once the ODAA staff has determined that a complaint merits further investigation, or if the allegation involves sexual harassment, sexual assault or any form of sexual violence. During this investigation, the ODAA staff will:

- Reasonably inform the Respondent of the Complainant's allegation(s);
- Review all University records that concern the complaint;

9

MG_0203

- Interview witnesses;
- Review statements provided by the Complainant and the Respondent;
- Review other relevant evidence; and
- Take all reasonable steps necessary to complete the investigation within 90 calendar days after receipt of the complaint. ODAA may extend this deadline for a reasonable period of time, as needed. ODAA will inform the parties if an extension is needed.

### Evidence Standard

The evidentiary standard applied in all ODAA investigations is the "preponderance of the evidence." In other words, the question that must be posed and answered is whether it is "more likely than not" that any alleged event(s) occurred. If the answer is yes, the complaint has been substantiated. In reaching its findings, the ODAA staff shall evaluate all facts and evidence, and consider the severity and frequency of the alleged act(s).

### Respondent's Refusal to Cooperate

If the Respondent is an employee who refuses to cooperate and/or respond in a timely manner, ODAA may forego completion of an investigation and refer the matter to Labor Relations, as appropriate, or the office may take any other action it deems necessary and appropriate to address the situation. If the Respondent is a student who refuses to cooperate and/or respond in a timely manner, ODAA may forego completion of an investigation and refer the matter to the University Community Standards Office and/or Student Affairs, as appropriate.

### Complainant's Inaction or Decision Not to Cooperate

During an investigation, if a Complainant declines to cooperate with ODAA or if the office determines that the Complainant no longer wishes to pursue a complaint, ODAA may consider the matter closed and may take no further action, with appropriate notification to the parties. ODAA also reserves the right to continue its investigation, regardless of Complainant cooperation or involvement.

### Complaint's Withdrawal of Complaint

If a Complainant withdraws a complaint, such a decision should be communicated in writing to the ODAA staff. The University may, nevertheless, chose to investigate the allegation(s).

### At the Conclusion of the Investigation

The ODAA staff issues a written statement indicating whether the complaint was substantiated. If the complaint was substantiated:

10

MG_0204

(i)     **For Students** – the ODAA may refer the matter to the University Community Standards Office for appropriate action (if any) under the applicable Student Conduct Code.

(ii)    **For Employees (including student employees) not in a Collective Bargaining Unit** – in consultation with Labor Relations and the Office of General Counsel, appropriate administrative action may be taken.

(iii)   **For Employees in Collective Bargaining Units** – the ODAA may refer the matter to Labor Relations for investigation under the applicable collective bargaining agreement.

Upon concluding its investigation, ODAA will assure that steps will be taken to prevent discrimination and harassment, to prevent the reoccurrence of discrimination and harassment, and to remedy the discriminatory effects on the Complainant(s) and others, if appropriate.

*Appeal*
There is no right of appeal from the findings of an investigation conducted by ODAA.

11

MG_0205

**To file a complaint pursuant to this procedure, request assistance or for additional information, please contact:**

**Raul M. Sanchez, JD**
Title IX Coordinator
*Senior Director for Title IX and Risk Management*
Office of the President
310 Administration Building
Stony Brook, NY 11794-0701
Email: Raul.sanchez@stonybrook.edu
Phone: 631-632-6975

**Office of Diversity and Affirmative Action (ODAA)**
West Campus Office
201 Administration Building
Stony Brook, NY 11794-0251
Phone: 631-632-6280
Fax: 631-632-9428

**Office of Diversity and Affirmative Action (ODAA)**
University Hospital Satellite Office – **by appointment only**
Level 5, Room 624
Phone: 631-632-6280
Fax: 631-632-9428

**For additional information, visit the ODAA website at:**
**www.stonybrook.edu/diversity**

12

MG_0206

## *Appendix A*

### *External Enforcement Agencies*

**New York State Division of Human Rights**
**State Headquarters**
New York State Division of Human Rights
One Fordham Plaza
4th Floor
Bronx, New York 10458
Tel: (718) 741-8400
Email: InfoBronx@dhr.ny.gov

**Long Island District**
New York State Division of Human Rights
175 Fulton Avenue, Suite 404
Hempstead, New York 11550
Tel: (516) 538-1360
Email: InfoLongIsland@hdr.ny.gov

New York State Division of Human Rights
State Office Building
Veterans Memorial Building
250 Veterans Memorial Highway
Suite 2B-49
Hauppauge, New York 11788
Tel: (631) 952-6434
Email: InfoLongIsland@hdr.ny.gov

**Office of Sexual Harassment**
New York State Division of Human Rights
Office of Sexual Harassment
55 Hanson Place, Room 900
Brooklyn, New York 11217
Tel: (718) 722-2060

**Office of Federal Contract Compliance**
**Programs**
**New York District Office**
26 Federal Plaza, Room 36-116
New York, New York 10278-0002
Tel: (212) 264-7742
Fax: (212) 264-8166

**Equal Employment Opportunity Commission**
**New York District Office**
33 Whitehall Street, 5th Floor
New York, New York 10004
Tel: (800) 669-4000
Fax: (212) 336-3790

**Office of Civil Rights - National**
**Headquarters**
Lyndon Baines Johnson (LBJ)
U.S. Department of Education Building
400 Maryland Ave, SW
Washington, DC 20202
Tel: (202) 401-0418
Fax: (202) 260-7465

**Office of Civil Rights – New York**
U.S. Department of Education
Financial Square
32 Old Slip, 25th Floor
New York, New York 10005
Tel: (646) 428-3906
Fax: (646) 428-3904

13

MG_0207

# EXHIBIT E



SUNY   The State University
of New York

**State University of New York**

# Policies of the
# Board of Trustees

**June 2014**

MG_0240

# THE STATE UNIVERSITY OF NEW YORK

## H. Carl McCall
Chairman

## Nancy L. Zimpher
Chancellor

## Joel Pierre-Louis
Secretary of the University

A full listing of Members of the Board of Trustees and Chancellor's Cabinet is

available at www.suny.edu

Information regarding Policies of the Board of Trustees is available at:

The State University of New York
State University Plaza
Office of the Secretary and the Board of Trustees
Albany, New York  12246
518-320-1157 trustees@suny.edu

**Policies of the Board of Trustees**                                    **Page 2**

MG_0241

**Article X: COLLEGE FACULTY**

§ 1. *Composition* ..................................................................................................25
§ 2. *Chair and Presiding Officer* ..........................................................................25
§ 3. *Voting Faculty* ...............................................................................................25
§ 4. *Responsibility* ...............................................................................................26
§ 5. *Bylaws* ...........................................................................................................26

**Article XI: APPOINTMENT OF EMPLOYEES**

Title A. Procedure
§ 1. *Procedure*......................................................................................................26

Title B. Continuing Appointment
§ 1. *Definition* ......................................................................................................27
§ 2. *Method of Appointment*.................................................................................27
§ 3. *Eligibility* .......................................................................................................27

Title C. Permanent Appointment
§ 1. *Definition* ......................................................................................................28
§ 2. *Method of Appointment* .................................................................................29
§ 3. *Initial Appointment* ........................................................................................29
§ 4. *Eligibility for Initial Permanent Appointment* ..............................................29
§ 5. *Change in Professional Title* .........................................................................31

Title D. Term Appointment
§ 1. *Definition* ......................................................................................................33
§ 2. *Eligibility* .......................................................................................................33
§ 3. *Method of Appointment* .................................................................................33
§ 4. *Renewal of Term* ...........................................................................................33
§ 5. *Notice* .............................................................................................................34
§ 6. *Other Appointments* ......................................................................................35
§ 7. *Service Not Credited* .....................................................................................43

MG_0245

**TITLE D. TERM APPOINTMENT**

§ 1. *Definition*. Except as provided in Section 6 of this Title, a term appointment shall be an appointment for a specified period of not more than three years which shall automatically expire at the end of that period unless terminated earlier because of resignation, retirement or termination.

§ 2. *Eligibility.*

(1)   A term appointment may be given to any person appointed to or serving in a position designated as being in the Professional Services Negotiating Unit.

(2)  Part-time service.

(a)   Further employment at any college of an individual who has been employed at that college on a part-time basis for four consecutive semesters in a position designated as being in the Professional Services Negotiating Unit shall be on the basis of a term appointment. In computing consecutive semesters of part-time service for the purposes of appointment or reappointment under this subdivision, periods of leave of absence at partial salary or without salary shall not be included, but shall not be deemed an interruption of otherwise consecutive service. An individual who has been granted term appointment but for whom classroom enrollment is inadequate shall have no entitlement to salary, benefits, or any other rights or privileges.

(b)   In the event the service of such an individual is interrupted for a period of four consecutive semesters or more, the chief administrative officer of the college may grant the employee any type of appointment as in the chief administrative officer's judgment is appropriate.

§ 3. *Method of Appointment.* All term appointments shall be made by the chief administrative officer of the college and shall be reported to the Chancellor.

§ 4. *Renewal of Term.* Except as provided in this Article, term appointments may be renewed by the chief administrative officer of the college for successive periods of not more than three years each; such renewals shall be reported to the Chancellor. No term appointment,

MG_0272

of itself, shall be deemed to create any manner of legal right, interest or expectancy in any other appointment or renewal.

§ 5. *Notice.* In the event a term appointment is not to be renewed upon expiration, the chief administrative officer or the chief administrative officer's representative will notify the appointee in writing not less than:

(a) Forty-five calendar days prior to the end of a part-time service term appointment;

(b) Three months prior to the end of a term expiring at the end of an appointee's first year of uninterrupted service within the University. For such employees serving on the basis of an academic year professional obligation and academic employees at the Empire State College whose terms end in June, July or August, notice shall be given no later than March 31;

(c) Six months prior to the end of a term expiring after the completion of one, but not more than two, years of an appointee's uninterrupted service within the University. For such employees serving on the basis of an academic year professional obligation and academic employees at the Empire State College whose terms end in June, July or August, notice shall be given no later than December 15;

(d) Twelve months prior to the expiration of a term after two or more years of uninterrupted service within the University;

(e) Six months prior to the expiration of a term for titles listed in Appendix B(1) and B(2), infra; and

(f) Employees who intend to leave the employ of the University shall give 30 days notice to the chief administrative officer or the chief administrative officer's representative. In the event that an employee fails to provide the full 30 days notice, it shall be within the discretion of the chief administrative office or the chief administrative officer's representative to withhold from such employee's final check an amount equal to the employee's daily rate of pay for each day less than the required 30 days. Such action shall not constitute discipline.

MG_0273

# EXHIBIT F



# AGREEMENT
## *between*
# UNITED
# UNIVERSITY
# PROFESSIONS
## *and the*
# STATE
# OF NEW YORK

*July 2, 2011 – July 1, 2016*

## TO SEARCH THIS DOCUMENT:

Press and hold the Control key. While holding the Control key, type the letter f. A search box will pop up, allowing you to search the document.

budget certificate titles are "Professor and Department Chairman"; provided, however, the provisions of such Section pertaining to extra service and summer employment shall apply.

## ARTICLE 26
**Jury Service**

On proof of necessity of jury service, an employee shall be granted leave with pay without charge to leave credits. Leave with pay for jury service shall mean leave at the rate of pay the employee would have received had the employee not been on such leave.

## ARTICLE 27
**Professional Meetings**

The State and UUP recognize the importance of attendance at professional meetings to professional growth and development and, accordingly, departments are encouraged to make funds available for attendance at such meetings. Where funds are made available, the employee shall not be required to charge leave accruals for such attendance.

## ARTICLE 28
**Medical Assistance**

Each College shall promulgate procedures to be followed in the event of a medical emergency involving an employee of the College while on the College premises.

## ARTICLE 29
**Clinical Practice**

§29.1 The provisions of Article XVI of the Policies shall be subject to review in the grievance procedure.

§29.2 It is the express understanding of the parties that Section 17 of the Public Officers' Law does not cover any malpractice claims that arise from the conduct of or participation in the clinical practice plan.

## ARTICLE 30
**Appointment, Evaluation and Promotion**

§30.1 Appointments

Appointments of employees shall be made in accordance with Article XI of the Policies. After three consecutive years of full-time service on the basis of a temporary appointment, a full-time employee whose employment is continued on the basis of a temporary appointment shall be given the reasons for such appointment. The appropriate remedy for failure to receive such reasons shall be to have them provided.

§30.2 Evaluation and Promotion

a. Evaluation and promotion of employees shall be made in accordance with Article XII of the Policies.

b. Subject to provisions of this Agreement, the system of evaluation for professional employees shall be as specified in the Memorandum of Understanding dated September 30, 1981, between the University and UUP relating to a system of evaluation for professional employees, and the system of promotion for professional employees shall be as specified in the Memorandum of Understanding dated August 8, 1989, between the University and UUP relating to a system of promotion for professional employees. Such Memoranda of Understanding shall be statements of mutual intentions and shall not constitute agreements under Article 14 of the Civil Service Law or for any other purpose.

§30.3 a. All employees shall, upon appointment, receive a notice of appointment or reappointment containing the following information:

1. Academic or professional rank, if applicable, and official State title;

39

2. Type of appointment, i.e., Term, Continuing, Permanent or Temporary;

3. Duration of appointment if a term, or expected duration if a temporary appointment;

4. Basic annual salary, if appropriate, or rate of compensation; and

5. Effective date of appointment.

b. In addition, part-time employees shall receive an appointment letter which includes the following information on required assignments if applicable:

1. Teaching;

2. Advisement and/or governance; and

3. Research and/or community service.

c. In addition, part-time employees shall receive an appointment letter which identifies the benefits for which they are eligible:

1. Health;

2. Leave; and

3. Other (specify).

## ARTICLE 31

**Personnel Files**

§31.1 a. Each College shall maintain, for official University purposes, an official personnel file for each employee who is subject to this Agreement. Such file shall contain copies of personnel transactions, official correspondence with the employee and formal, written evaluation reports prepared in accordance with provisions of Article XII, Title A, Section 3 and Article XII, Title C, Section 4 of the Policies and such other written evaluations and/or recommendations as may be prepared by an immediate supervisor, Department Chairperson, Dean, Vice President, or other persons serving in a supervisory capacity in a direct line, as appropriate, in connection with matters of appointment, evaluation, reappointment or promotion. With respect to the latter written evaluations and/or recommendations, those which pertain to reappointment shall be sent to the employee at the time they are prepared. All materials referred to in this Section shall be available to an employee for review and response. In no event shall statements which are both unsolicited and unsigned be placed in the official personnel file. Statements that are unsolicited and signed shall be placed in the official personnel file and shall be available to an employee for review and response.

b. Upon receipt of the "other written evaluations and/or recommendations" referred to in subdivision (a) which pertain to reappointment, an employee who has completed three or more consecutive years of service in a position of academic or qualified academic rank or in a professional title shall, upon written request, be entitled to a meeting with the person who prepared a written evaluation and/or recommendation described in this subdivision to discuss the basis for such written evaluation and/or recommendation. The employee shall not be entitled to representation during such meeting. No part of the discussion held pursuant to provisions of this subdivision shall be subject to review in the grievance procedure. However, an employee may respond to information obtained during such discussion and may place in the employee's official personnel file or evaluative file any such response which is in writing.

§31.2 a. An employee shall have the right to examine the employee's personnel file during normal business hours. Statements solicited in connection with the employee's appointment, evaluation, reappointment or promotion, with the exception of the written evaluations or recommendations referred to in Section 31.1 above, shall not be available to that employee.

b. When a statement is solicited pursuant to Article 31.2(a) such statement shall be made available to that employee according to the respondent's reply to the following:

1. May the candidate read this recommendation? yes/no

2. May the candidate read this recommendation if all identification as to its source is deleted? yes/no

If the respondent does not reply to the above, or if the respondent's reply is negative, the statement shall not be available to the employee.

c. Upon an employee's request to review the official personnel file, the College shall prepare, or update as appropriate, a log of those materials in the official personnel file which are available to both the employee for review and response pursuant to this Section. Such log shall be retained in the employee's official personnel file. If upon review in the grievance procedure it is determined that such a log has not been prepared, retained, or updated, the sole remedy shall be a direction to the college to, as appropriate, prepare, retain, or update such log in conformity with this Section.

§31.3 A designated representative of UUP, having written authorization from the employee concerned, and in the presence of a representative of the University, may examine the official personnel file of the employee, except for the limitation provided above, if the examination relates to a filed grievance, a grievance in preparation, or written notice of discipline served upon the employee by the University.

§31.4 Copies of materials in an employee's official personnel file to which the employee is permitted access pursuant to provisions of this Article shall be made available to the employee upon request and at the employee's expense and the employee may file a statement in response to any such item.

§31.5 Unless prohibited by law, an employee shall be notified of any request for access to the employee's official file other than related to official University purposes.

§31.6 a. Where, in connection with consideration of an academic employee for appointment, reappointment, or promotion, a file of evaluative material is developed by a committee or committees of academic employees which may exist to evaluate and make recommendations with respect to appointment, reappointment, or promotion of an academic employee, and where such file is first submitted to the last management administrative officer of the College for consideration, the academic employee to whom the file pertains shall, subject to subdivision (d), have at least five (5) working days to both examine such file and file a statement in response to any item contained therein; provided, however, statements solicited in connection with the employee's appointment, reappointment, or promotion and any documents which would identify the source of the statements, shall not be available to the employee.

b. Where, in connection with consideration of a professional employee for appointment, reappointment, or promotion, a file of evaluative material is developed by a committee or committees of professional employees which may exist to evaluate and make recommendations with respect to appointment, reappointment, or promotion of a professional employee, and where such file, or the personnel file, or part thereof, if that is the file that is used, is first submitted to the last management administrative officer of the College for consideration, the professional employee to whom the evaluative or personnel file, or part thereof, pertains shall, subject to subdivision (d), have at least five (5) working days to both examine such file and file a statement in response to any item contained therein; provided, however, statements solicited in connection with the employee's appointment, reappointment, or promotion and any documents which would identify the source of the statements shall not be available to the employee.

c. Examination of the file and response to material contained therein to which the employee has access pursuant to subdivision 31.6(a) or subdivision 31.6(b) shall take place after the file has been submitted to the management administrative officer of the College, but prior to this officer's consideration of its content. The management administrative officer of the College, or designee, shall notify the employee as to the specific place, dates and times when the file will be available for purposes of subdivision 31.6(a) or subdivision 31.6(b), as appropriate. Following expiration of the period allotted for employee's examination and response, the management administrative officer of the College may proceed to consider the content of such file.

d. Nothing contained herein shall prevent the management administrative officer of the College referred to in subdivision (c) or the College President from taking such action as the College President may deem necessary to meet notice requirements in the event of non-renewal of term appointments.

41

## ARTICLE 32

**Notice of Non-Renewal**

§32.1 Written notice that a term appointment is not to be renewed upon expiration is to be given to the employee by the College President, or designee, not less than

a. 45 calendar days prior to the end of a part-time service term appointment;

b. Three months prior to the end of a term expiring at the end of an appointee's first year of uninterrupted service within the University. For such employees serving on the basis of an academic year professional obligation and academic employees at the Empire State College whose terms end in June, July or August, notice shall be given no later than March 31.

c. Six months prior to the end of a term expiring after the completion of one, but not more than two years of an appointee's uninterrupted service within the University. For such employees serving on the basis of an academic year professional obligation and academic employees at the Empire State College whose terms end in June, July or August, notice shall be given no later than December 15;

d. Twelve months prior to the expiration of a term after two or more years of uninterrupted service within the University.

e. Notwithstanding the above provisions, full-time employees with titles in Appendix B-1 and B-2 of Article XI of the Policies of the Board of Trustees shall receive not less than six months' notice prior to the expiration of a term appointment.

§32.2 Employees who intend to leave the employ of the University shall give 30 days' notice to the President or designee. In the event an employee fails to provide the full 30 days notice, it shall be within the discretion of the President or designee to withhold from such employee's final check an amount equal to the employee's daily rate of pay for each day less than the required 30 days. Such action shall not constitute discipline.

§32.3 In the event the University elects to terminate a term appointment before the expiration of the term, the University will pay such employee's balance of salary for up to the maximum of the time remaining on the term appointment at the time of such termination.

## ARTICLE 33

**Job Security Review Procedures**

§33.1 Definitions

a. "Professional staff" shall mean all persons occupying positions designated by the Chancellor as being in the unclassified service.

b. "Initial academic review" shall mean a review and recommendation by a committee of academic employees at the departmental level or, in the event academic employees are not organized along departmental lines, at the division, school, college or other academic employee organizational level next higher than the departmental level, which may exist for the purpose of evaluating an academic employee for continuing appointment.

c. "Subsequent academic review" shall mean a review and recommendation by a committee of academic employees at the division, school, college or other academic employee organizational level next higher than the initial academic review committee which may exist for the purpose of evaluating an academic employee for continuing appointment.

d. "Immediate supervisor" shall mean the person designated by the College President for purposes of evaluating a professional employee pursuant to the Policies of the Board of Trustees.

e. "Working days" shall mean Monday through Friday, excluding holidays.

§33.2 Request for Reasons

An academic or professional employee, within 10 working days following receipt of written notice that the employee's term appointment will not be renewed upon its expiration, further employment following which expiration would be required by the Policies of the Board of Trustees to be on the basis of continuing or permanent appointment, as the case may be, may

42

# EXHIBIT G

Not filed on ECF/CM since

Confidential Educational Record under FERPA

[Full exhibit is contained in Plaintiff's service copy
and in the Court's courtesy copy]

# EXHIBIT H

Cepeda, J, J

New York State University Police at Stony Brook
Stony Brook, New York 11794-5501

Incident Report

| 13-14509 | 05/24/2013 | Crisis Intervention |
|---|---|---|

Location of Incident: Old Engineering
Time Received: 04:43 PM

Day of Week: Friday
Dispatcher:

**PERSONS INVOLVED**

| Complainant | Michael Dudley | ENGINEERING Room 308 | ▮▮▮▮ |
| | ▮▮▮▮ | ▮▮▮▮ | |
| Mention | Molly M Gentleman | 655 Belle Terre Rd Apt 94, Port Jefferson, NY 11777 | ▮▮▮▮ |
| | Home:     Cell: | | |
| Other | Alexander M Orlov | ENGINEERING Room 314 | ▮▮▮▮ |
| | ▮▮▮▮ | ▮ | |

**NARRATIVE**

MG_0344

**New York State University Police at Stony Brook**
**Stony Brook, New York 11794-5501**

**SE NUMBER:** 13-14509
**TITLE OFFENSE:** Crisis Intervention
**DATE:** 5/24/2013

---

On May 24th 2013, at approximately 1657 hours, this Officer responded to Engineering to  take a report of a possible work place violence incident. Upon arrival, I spoke with Michael Dudly, Department Chair. He stated that on 05/22/13, at approximately 1500 hours, he was told by Assistance Professor Alexander M. Orlov, that co-worker Molly M. Gentleman stated that she felt like getting a gun and shooting it. Complainant stated Ms. Gentleman has been frustrated by stress related to work.  Due to the nature of the language complainant felt it was necessary to report it to University Police. Alexander Orlov and Molly Gentleman were not available for interview. Ms. Gentleman being referred to labor relation. It is unknown if Ms. Gentleman has access to weapons.

MG_0345

Stony Brook University Police
(631) 632-3333


Narrative Report

| 13-14509 | Order Maint. | 5/24/2013 |
|----------|--------------|-----------|

Location of incident: Old Engineering
Date Occurred: 05/24/2013
Time Occurred: 16:57:00


On May 24th 2013, at approximately 1657 hours, this Officer responded to Engineering to take a report of a possible work place violence incident. Upon arrival, I spoke with Michael Dudly, Department Chair. He stated that on 05/22/13, at approximately 1500 hours, he was told by Assistance Professor Alexander M. Orlov, that co-worker Molly M. Gentleman stated that she felt like getting a gun and shooting it. Complainant stated Ms. Gentleman has been frustrated by stress related to work. Due to the nature of the language complainant felt it was necessary to report it to University Police. Alexander Orlov and Molly Gentleman were not available for interview. Ms. Gentleman being referred to labor relation. It is unknown if Ms. Gentleman has access to weapons.

CEPEDA, J

MG-341

 **Stony Brook University**

Barbara Chernow <barbara.chernow@stonybrook.edu>

## Fwd: Meeting request
1 message

**Barbara Chernow** <barbara.chernow@stonybrook.edu>                    Wed, May 29, 2013 at 1:47 PM
To: Samuel Stanley <Samuel.Stanley@stonybrook.edu>, Dennis Assanis <dennis.assanis@stonybrook.edu>,
Yacov Shamash <Yacov.Shamash@stonybrook.edu>

Please see report below.


Barbara Chernow
Senior Vice President for Administration
Stony Brook University, NY  11794-1002
Tel:  631-632-6340
Fax: 631-632-6111

 **Stony Brook University**


---------- Forwarded message ----------
From: **Robert Lenahan** <robert.lenahan@stonybrook.edu>
Date: Wed, May 29, 2013 at 1:41 PM
Subject: Re: Meeting request
To: Barbara Chernow <barbara.chernow@stonybrook.edu>


Barbara,

As discussed, on May 24th at 5 PM Larry received a call from Yacov and Suzanne Shane in regards to a
possible Workplace Violence Incident in Old Engineering. Based on that call, an officer responded and
interviewed the department chair, Michael Dudley. He indicated that two days earlier Assistant Professor Orlov
informed him that he was involved in a prior disagreement with Molly Gentleman during which Molly stated that
"she felt like getting a gun and shooting it". This alleged incident and reference to a firearm occurred on April
24th, a month prior to our becoming aware.  At the time of the initial report, neither Ms. Gentleman or Mr. Orlov
was present or available for interview.

Because of the threat of WPV and the reference of a gun, the case was referred to University Police Investigators
for follow up. Yesterday, detectives contacted Mr. Orlov who further reiterated that during an argument with Molly,
she stated to him "one day I will tell you guys to stay home and I will get a gun and come to campus". Mr. Orlov
indicated this incident happened approximately four weeks earlier and in the presence of Jason Trelewicz,
another Assistant Professor.

As a follow up, two plain clothes investigators went to Old Engineering to speak with Molly regarding her
comments and threats. As they arrived, Molly was in the hallway speaking to two students. The investigator
waited a while and then attempted to speak with Molly without identifying who they were. According to
investigators, Molly seemed startled and insisted they identify themselves. The investigator whispered they were
from University Police and wanted to speak about a private matter. Molly and the investigators went to a private
area and during their conversation, Molly admit MG-1008 ts about the firearm and that she was

frustrated with the whole issue of work space and the ongoing disagreements with her co-workers. She further stated the weapons comment was in response to similar comments made by Jason Trelewicz. Molly further indicated that she does not own or possess a weapon and that she has been under a lot of stress lately. Suffolk County Pistol License Section was contacted to determine if Molly legally owns a weapon. At the conclusion of the interview, investigators determined there was no imminent threat and Ms. Gentleman remained on site when they left. Further, investigators informed Ms. Gentleman about various options available to her, including ODAA and Labor Relations. She indicated in her previous employment she had a bad experience with ODAA and declined that option.

At this point, we are satisfied there is no criminality involved and the entire matter has been referred to Labor Relations. As always, we will assist Labor Relations with whatever information they need.

I do remain concerned that faculty members were aware of threats of using a gun as early as April 24th and no one was made aware until nearly a month later.

If you need anything else, let me know.

Bob


**Robert J. Lenahan**
**Chief of Police**
**Asst. V.P. for Campus Safety**
**Stony Brook University**
Robert.Lenahan@stonybrook.edu


On Wed, May 29, 2013 at 6:03 AM, Barbara Chernow <barbara.chernow@stonybrook.edu> wrote:

Call me this morning ?

——— Forwarded message ———
From: "Samuel Stanley" <samuel.stanley@stonybrook.edu>
Date: May 29, 2013 4:40 AM
Subject: Fwd: Meeting request
To: "Dennis Assanis" <dennis.assanis@stonybrook.edu>, "Barbara Chernow"
<Barbara.Chernow@stonybrook.edu>, "Yacov Shamash" <Yacov.Shamash@stonybrook.edu>
Cc:

Dennis and I should have been briefed on this.

Samuel L. Stanley Jr., M.D.
President
Stony Brook University
310 Administration Building.
Stony Brook, NY 11794-0701
631-632-6265
samuel.stanley@stonybrook.edu

## MG-1009

# EXHIBIT I

Statement of Alexander Orlov

Date: May 29, 2013

I am an Asst. Professor in Material Science & Engineering in the College of Engineering and Applied Sciences. I have been here since Feb. 2008. I know Molly Gentleman as a colleague. I'm not friends with her outside of work. I don't interact that much with her but we have a friendly work relationship.

In or about the week of May 5, 2013, I joined Molly and Jason who were talking outside the Heavy Engineering building and we talked about work & we talked about some colleagues. The conversation involved the general work environment. She became visibly upset. She looked shaken and appeared angry about a particular situation about politics in the dept. that wasn't directed at her. She had a trembling voice. Suddenly she made a statement to the effect that, "Alex and Jason, one day I'll tell you to stay home and not to come in to the department & I'll take a gun and come on campus and start shooting." She looked upset and serious when she said that. I felt awkward and don't remember if I said anything. I didn't want to continue the conversation. I think Jason said, "ok." I didn't know if it was a real threat. I felt uncomfortable because I didn't know what to do. I know she is known to have emotional mood swings. I know she is struggling to get funding. When she discusses it, she goes from smiling optimistically to crying, which is not typical behavior in the workplace. I spoke to some people in the department about what she said, such as Sanjay Sampath, Mike Dudley, Clive Clayton, and Bob Martin, who is a building manager. I didn't initially report it because I didn't want to damage her career. I know how hard it is to survive as an Asst. Professors. I did eventually speak to the Chair, Prof. Dudley but I didn't know he would report it. I do try to avoid her because I did think what she said was outrageous and I question her judgment. I am concerned about working with her, given her emotional instability and the fact that she likely knows that I made this report. There are plans for her students and Jason's students and my students to share a large space and I am concerned about interacting with her. I am not as much concerned about my safety as much as dealing with her emotional reactions. I am hoping the situation calms down and nothing comes of it. I don't want to harm her professionally. I didn't realize it would precipitate the police investigating.

I have read and do affirm that the statement I have given as written above in response to questions asked of me, is true and accurate to the best of my knowledge. I understand the confidentiality of this matter and will not discuss what has been said at this meeting with others. I will be available to testify in the event of an arbitration hearing.

_____           May 29, 2013
Signature                           Date

MG-995

# EXHIBIT J

Statement of Jason Trelewicz

Date: May 29, 2013

I am an Asst. Professor in Material Science & Engineering in the College of Engineering and Applied Science. I have been here since September 2012. I was also an undergraduate student here from 2000-2004. Molly Gentleman is also an Asst. Professor, who also started here in Sept. 2012. I am not friends with her outside of work but in the beginning I did occasionally reach out to her and invited her out with my wife and me for coffee because I knew she was new to the area and didn't have any friends or family around. I was friendly with her.

In or about April, 2013, she and I were walking back from the SAC and met up with Alex Orlov, our colleague between Light & Heavy Engineering and we were talking, venting about the woes of first-year professors, such as proposals getting rejected, difficult students etc. and She said that she was generally frustrated & said, "I want to shoot up the campus!" or words to that effect. She was in between saying something in jest, then was serious and then laughed. I said, "I hope I'm on your good list & can you let me know the day you do it so I can stay home." What she said made me uncomfortable and I was tried to make light of it. She laughed and said, "You're ok" or words to that effect. At that time I didn't feel it was an imminent threat but it was uncomfortable in today's climate. I didn't think to report it.

Since that time, our relationship has deteriorated, but it has nothing to do with her comment. She yells at her grad students and puts them down. She's very emotional, and has cried multiple times in front of me. On or about May 8, 2013, we had a visiting professor from Germany that was invited by the Dept. who I will be collaborating with. I had plans to go to lunch with him. She came into my office while I was on the phone. I told her I'd see her when I got off the phone. I stayed at the doorway to her office while she was seated at her desk. She told me she was coming to lunch with me and the professor because she had been given no time with him and that she had a very busy afternoon. I said let me check with Sanjay to see if he's available now for Molly to show him her lab because the lunch meeting was the only time I would have to talk with him about our collaboration and because she was busy in the afternoon. I spoke with Sanjay and he said she could have 25 minutes with the professor right then. I went to tell her again at her doorway and said he'll be here in 2 minutes so you can meet with him until noon. *and you don't have worry about coming to lunch since you're busy.* At that point she stood up and said at me, "you know Jason, if you don't want me to come to lunch with you just say so!" She appeared very angry. I replied *words* to the effect, "Please don't speak to me that way. I was trying to be nice. You're welcome to come to lunch with us." *while I walked back to my office* Alan Green, who sits in the office between us did say, "It's ok Jason, you're always nice." I think he was trying to make light of the exchange." I said thank you, I appreciate that Alan.

For about a week later, I felt that Molly was still mad at me but I still said good morning to her and invited her to get coffee or get snacks. She didn't accept my invitations. About a week later, I tried to clear the air. I went to her office and sat across from her at her desk. I apologized for raising my voice and bringing any emotion to the exchange. She said, "Honestly Jason, I don't know what to do with you. You got violent and physical, your face got red and your fists were clenched. I said," I don't know what you are talking about. That's a serious allegation." She said, "you have a tendency to bully me and attempt *and was quite stunned by* v *uation.*

MG-996

to perform behavior modification on me. But you're the only one here that has been consistently a friend to me." At that point she was crying. She also told me then that she had recently broken up with her boyfriend and that she had no friends or family and was lonely. I said, "All I can do is apologize for my part in the disagreement. I am very willing to be a friend to you if you'll let me. The ball is in your court." She said, "I just don't know." That was the end of it.

Since then, I have heard reports that Molly had accused me of being violent to my colleagues, both of whom I have a long-standing professional and personal relationship with. I am concerned about these reports. I am also concerned that she thinks I reported her as making the comment about shooting when I did not report it. This morning I returned a textbook to her and she slammed her office door on me, nearly on my hand. I am concerned about working with her, especially after this morning. However, I'm not looking to damage her career by any means and would be willing to sit down with her and put everything behind us.

I have read and do affirm that the statement I have given as written above in response to questions asked of me, is true and accurate to the best of my knowledge. I understand the confidentiality of this matter and will not discuss what has been said at this meeting with others. I will be available to testify in the event of an arbitration hearing.

Signature                                        Date  05/29/2013

MG-997

# EXHIBIT K

*INTERROGATION STATEMENT*

*This statement was given on June 7, 2013 to Tracy Haas, Manager of Employee and Labor Relations.*

**Employee Name:** - Molly Gentleman

1    **Current Mailing Address: 655 Belle Terre Road, Apt. 94, Port Jefferson, NY 11777**
2    **Phone:** ▇▇▇▇▇▇▇
3
4    I, Molly Gentleman make the following statement on this 7thth day of, June, 2013 at or about 10:00 a.m. in
5    the office of Tracy A. Haas, Employee and Labor Relations, Administration Building, Stony Brook
6    University, Stony Brook, New York 11794. I have received a copy of my Article 19 rights and I
7    understand those rights. I am represented by Artie Shertzer, UUP President at this time.
8
9    I have been advised that I am obligated to truthfully answer the questions asked during this interrogation.
10    My failure to do so may result in disciplinary charges in addition to those already considered.
11
12    Is there any reason why you may not be able to understand or to respond to questions that I will be
13    asking today? No.
14
15    I work in College of Engineering, Material Science & Engineering. I am an Asst. Professor. I report to
16    Michael Dudley, Chair of Materials Department. I have been here since September, 2012. I know Alex
17    Orlov and Jason Trelewicz. We are colleagues and friends. I socialize with them outside of work. There is
18    no romantic interest between me and them. I get along with them at work. All winter, Alex stopped by my
19    lab after the students left to chat with me for about half hour. I went to get coffee with Jason very
20    regularly. All 3 of us have gone for coffee and lunch together. We've also gone out for drinks after work as
21    well. Jason and I have written grants together and I've reviewed multiple grants for Jason & Alex has
22    reviewed work for me in a similar way. Alex and I G-chat late at night and during the weekends as well.
23    Alex also volunteered to get groceries for me when I broke my foot.
24    On Apr. 24, 2013, (I know the date because I have an e-mail that shows I asked them for coffee) That
25    morning, Jason came by my office and asked me to go for coffee. We walked over to the SAC and Jason
26    was complaining about an electrician, because he's having a house built. When we got back to near
27    Heavy Engineering, Alex met up with us and all three of us chatted. They were both angry about the
28    hiring of a woman, a Lecturer, Tatiana, into the department. Jason was angry that her start-up was the
29    same size as his start-up. (They both got $100,000, to start-up their lab, which is small.) Jason was angry
30    and was complaining about lab space and Alex complained he didn't have enough lab space. Then the
31    discussion moved onto the topic of the Boston bombing and I was upset because my friend was close to
32    it. Jason was making negative comments about MIT, about how people kill themselves at MIT & how the
33    shooting took place at MIT. I was uncomfortable so to lighten the mood, I made the comment to the
34    effect, that if I was going to do something like that that I would call you guys or e-mail you guys to stay
35    home that day. They both laughed and Alex said, "Thanks!" Jason left to go do something and Alex and I
36    remained talking. We talked another 2 – 3 minutes. It's not like I said this and they ran away in fear. That
37    was the last time I heard about that event. We remained friends after that. I have multiple e-mails
38    showing that we remained friendly. Alex e-mailed recommendations for gluten-free bakeries. I continued
39    to G-chat with Alex. Things were fine among the 3 of us until May 8, 2013 when we had a visitor come to
40    the University. Jason and I were supposed to take the visitor to lunch together. Jason got territorial and
41    told me I didn't need to come to lunch with him and their won't be time to talk to the visitor because he
42    needed to have a technical talk with him. I called him out on it because I felt the guy wanted to meet with
43    me. I said to him in an exasperated tone, "What, do you not want me to go to lunch with you? Because
44    you've told me 4 times I didn't need to come and there wouldn't be time to talk with him? He responded
45    very negatively, in a physical way, he was clenching his fist, his face got red, I was sitting at my desk, he
46    was in my doorway. He left and I immediately went to my mentor, Sanjay and said I was upset at how
47    Jason responded and that that I wouldn't be joining them for lunch. Sanjay said let it cool off for a few
48    weeks and then talk to him. I didn't really interact with Jason much during the following week or so About
49    a week later, he came into my office and said we need to talk. I didn't have time to talk. He said he

*I have read the above questions, answers and statements and they are accurate.*

*Employee Initials*
*Page 1 of 2*

READ

### INTERROGATION STATEMENT

*This statement was given on June 7, 2013 to Tracy Haas, Manager of Employee and Labor Relations.*

**Employee Name:**   -   Molly Gentleman

50   responded the way he did because I am an aggressive person in general.  I had been sitting at my desk
51   the entire time. I felt it was a sexist comment and felt that it was an example of studies show that men in
52   Engineering belittle women, the key word he used to describe me was "aggressive."  Jason clearly
53   wanted an apology and I wan't going to give it to him. I told him I needed time. I then spoke with Sanjay
54   about it and his advice was to let it go, and this will eventually dissipate. I also spoke with Dept. Head of
55   Civil, Harold (Hal) because he has a lot of experience with gender roles in Engineering. He said it
56   sounded like a gender issue. He made me feel better.   At that point, Jason seemed to be making an
57   effort and would ask me if I wanted anything from the SAC.  I thought things were resolved but then he
58   stopped talking to me. I didn't have time to investigate.   At this point we heard news from the Dean that
59   all three of us were going to move our grad students to one office. That e-mail came from Bob Martin on
60   May 17, 2013. Alex responded that he objected to that and at most it would be temporary. The e-mails
61   were unkind to Jason and you. On May 20, 2013, I sent an e-mail to all 3 to discuss what was going on.
62   We met to discuss the space.  We saw the space which was huge.  I thought our discussion went very
63   well.  Alex sent the e-mail that the Dean's office.  There were a series of e-mails regarding the problem
64   with the space and Alex's unhappiness with the space.  I have produced those e-mails.  There was a
65   reception for Debbie McKenzie on May 23, 2013 and we were all there.  Alex said hello to me. Everything
66   was fine.  The next thing I knew I was interviewed by the police on Tues. May 28, 2013. I was working in
67   the lab.  The police weren't in uniform but they announced themselves as police. Everyone in the lab
68   knew the police were looking for me. It was embarrassing in front of my students and post-doc.
69   I didn't mean anything by the statement.  They knew I meant nothing by the statement.  I think they
70   retaliated against me  because they were both angry at me over minor incidents (Alex was probably
71   reprimanded over the e-mail and I heard he was reprimanded over being a bully) and they worked each
72   other up. I don't think they thought their complaints would get this far.
73
74
75   I acknowledge that this is a true statement as told to the best of my recollection to Tracy Haas.   There is
76   nothing I would like to add to this statement at this time.  I have read this statement and made changes to
77   ensure that it conforms to the truth and signed it.  I understand that I may be subject to disciplinary action
78   for failing to answer truthfully.
79
80
81
82   Signed: _____            Date: _06/07/13_

*I have read the above questions, answers and statements and they are accurate.*

_____
*Employee Initials*
*Page 2 of 2*

# EXHIBIT L



Stony Brook University

*Employee and Labor Relations*

**Via regular & certified mail # 7004 2510 0000 1623 4384**

September 5, 2013

Molly Gentleman
655 Belle Terre Road, Apt. 94
Port Jefferson, NY 11777

Dear Ms. Gentleman:

This letter serves as a counseling letter regarding a statement you made on or about April 24, 2013 to your co-workers, Alex Orlov and Jason Trelewicz. Specifically, while you were informally conversing with them and talking about the Boston bombing you said words to the effect that if you were going to do something like that that you would call or e-mail them to stay home that day. You stated that they both laughed at your comment. You stated that you did not believe they thought you were serious because you continued your conversation with them for a few minutes, and that thereafter you continued to converse with them, e-mail with them, and G-chat with them over the next several weeks. You state that you heard nothing further regarding your comment until you were interviewed by University Police Officers on May 28, 2013. You believe that their complaints about your comment were motivated by work-place disagreements with you.

Taking the above into account, while it does not appear that you were serious when you made the comment, you are hereby put on notice that such comments should not be made in view of recent violent events on campuses, and could be construed as violating University Policy P521, "Disruptive Behavior Policy" and P519, "Workplace Violence Policy." In the future, it is expected that you will comply with Stony Brook University's policies.

Sincerely,

*Tracy Haas*

Tracy Haas,
Labor Relations Manager

cc: Personnel File

STONY BROOK, NEW YORK 11794-1015 TEL: 631-632-6140 FAX: 631-632-1360
http://www.sunysb.edu/lr/

MG_0231

# EXHIBIT M

Policies > P519: WORKPLACE VIOLENCE

# P519: WORKPLACE VIOLENCE

» Workplace Violence Procedure

**Issued by:**

Office of Administration

**Approved:**

April, 2008

**Revised:**

November 9, 2011

It is Stony Brook University's policy to promote a safe environment that is free from violence for all members of the University community. The University will not tolerate any acts of workplace violence, such as physical assaults or acts of aggressive behavior including but not limited to: An attempt or threat, whether verbal or physical, to inflict physical injury; Any intentional display of force that gives reason for someone to fear or expect bodily harm; Intentional and wrongful physical contact with a person without his or her consent that entails some injury; Stalking with the intent of causing fear of material harm to the physical safety and health of the individual.

Workplace violence may occur within a wide spectrum of interactions between students, faculty, staff, patients and visitors of the University. The University is committed to maintaining a campus environment that is free from workplace violence. It is the responsibility of all employees to create and maintain a campus environment free from and acts of workplace violence. Reports of incidents of workplace violence will be taken seriously and dealt with appropriately. Individuals who commit acts of workplace violence may be removed from the premises by University Police and referred for disciplinary action, criminal penalty or both.

In the event that employees observe or experience an incident of workplace violence involving an employee or visitor to the Stony Brook campus in which there is an imminent threat to someone's safety or an injury has occurred, the employee must immediately contact University Police and in addition notify their immediate supervisor. Employees or supervisors who become aware of a workplace violence incident in which there is no imminent threat and no physical injury has occurred may also report that incident to Human Resources. Human Resources will consult with the University Police Department on incidents reported directly to them. Questions about the workplace violence program, including what may constitute workplace violence should be directed to the Human Resources.

Pursuant to the University's commitment to a safe work environment, the University adopts the following Workplace Violence Prevention Program, which is developed and implemented with employee participation through authorized employee representatives. The University has established a Workplace Violence Prevention Team, which includes employee representatives, to perform risk evaluations and make recommendations for improved safety of the Campus.

## Reporting ACTS of Workplace Violence

**University Police**
Call 911 for University Police assistance from any Campus phone or (631) 632-*6333* from an off-campus phone.

## Questions/Information

**Human Resource Services**
390 Administration Building
(631) 632-*6151* Website: http://www.stonybrook.edu/hr/contact/

**Labor Relations**
390 Administration Building
(631) 632-*6140*

**University Medical Center Human Resources**
3 Technology Drive, Suite 100
Technology Park
East Setauket, NY 11733
(631) 444-*4700*

**Long Island State Veterans Home (LISVH) Human Resources**
100 Patriots Road
(631) 444-*8517*

**Employee Assistance Program (EAP)**
192 Administration Building (West Campus)
L-5 University Medical Center
Email: eap@notes.cc.sunysb.edu
Website: www.stonybrook.edu/eap

Policies > P521: DISRUPTIVE BEHAVIOR POLICY

# P521: DISRUPTIVE BEHAVIOR POLICY

» Disruptive Behavior Procedure

**Issued by:**

Office of Administration

**Approved:**

March 2010

## DISRUPTIVE, THREATENING, OR VIOLENT BEHAVIOR

*Students, faculty, and staff have the right to be free from acts or threats of disruptive behavior and/or physical violence, including intimidation, harassment and/or coercion, which involve or affect the University Community. The University does not tolerate any student, faculty member, administrator, or employee, acting individually or in concert with others, who clearly obstructs or disrupts any teaching, research, administrative, disciplinary, public service activity or any other workplace activity held on campus property. The University prohibits retaliation against those who report or cooperate in the investigation of disruptive behavior.*

## Related Documents:

University Hospital Policy—Disruptive Behavior (Contact Hospital Human Resources for a copy of this policy)

The Schools of the Health Sciences Disruptive Resident Behavior

Long Island State Veterans Home

P519 Workplace Violence

P520 Domestic Violence

P106 Sexual Harassment

## INQUIRIES / REQUESTS:

West Campus, Schools of the Health Sciences Stony Brook Manhattan and Stony Brook Southampton Faculty and Staff:

**Human Resource Services**

390 Administration Building
Stony Brook, NY 11794- 0751
Contact: (631) 632-6151
E-mail: hrs_info@stonybrook.edu

**Labor Relations**

Contact: (631) 632-6140

### Hospital Employees:

**Human Resources**

3 Technology Drive
Suite 100
Setauket, NY 11733-9300
Contact: (631) 444-4742 Ext 44

**Labor Relations**

Contact: (631) 632-6140

### Long Island State Veterans Home Employees:

**Human Resources**

100 Patriot Road
Stony Brook, NY 11790
Contact: (631) 444-8617

The *Employee Assistance Program* provides guidance for employees affected by disruptive behavior and will also assist employees with behavioral problems:

**Employee Assistance Program**

192 Administration Building (West Campus)
Contact: (631) 632-6085

**The East Campus Office/University Hospital**

is available by appointment

# EXHIBIT N

Stony Brook University

Employee and Labor Relations

# Counseling

A counseling session is a meeting between the supervisor and the employee which may focus on a specific incident, a particular aspect of an employee's performance which the supervisor has identified as needing improvement, or the employee's overall performance or conduct. The counseling process is initiated and executed at the department level by the supervisor and is not discipline. It is a face-to-face communication between the supervisor and the employee, conducted in private, and is intended to have a constructive goal of providing feedback to the employee to correct the problem.

If the counseling session is to be confirmed in a written memo after it takes place, generally you must inform the employee during the session that you will be writing a memorandum summarizing the discussion which will be placed in the employee's official personnel file.

**Note:** For matters concerning Research Foundation employees, contact the Employee and Labor Relations department for guidance.

## Guidelines for a Counseling Session

- Speak to the employee, on a timely basis, about the specific reason for the counseling session.
- Describe specific, observable, measurable and/or unacceptable conduct. Be prepared, have the facts in hand before you meet.
- State the effect of the problem on the work environment or on the employee's performance.
- Ask for the individual's perception of the problem and what is causing it. Encourage the employee to speak freely and candidly and listen to the information given. Keep an open mind.
- Ask the employee for potential solutions after you have explained what is acceptable work. Consider all options.
- If you think it is necessary, add your ideas also. Give the employee a reason to improve work attitude. Offer suggestions (for example, EAP) to help the employee improve/change conduct.
- Reach an understanding on a corrective action.
- Make sure you and the employee know what is expected of each other.
- Identify follow-up steps and dates. Meet again with the employee to review performance. Recognize improvements that have occurred.
- Incorporate unacceptable work performance in performance evaluation.

Guidelines for Writing a Counseling Memo accompanied with samples 🅿

**Note:** These guidelines are intended only to be a general framework for counseling and may not be appropriate under all circumstances. Please contact Labor Relations for assistance and guidance.

# Counseling and Discipline

COUNSELING FORMS

IMPROVING PERFORMANCE OR CONDUCT THROUGH COUNSELING

DISCIPLINARY ACTION

ADDRESSING DIFFICULT BEHAVIOR

LATENESS AND ABSENCE