**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------------X
MOLLY M. GENTLEMAN,

                        Plaintiff,

          - against -

STATE UNIVERSITY OF NEW YORK –
STONY BROOK,

                     Defendant.
----------------------------------------------------------------X

**MEMORANDUM**
**AND ORDER**

CV 16-2012 (JMA) (AKT)

**A. KATHLEEN TOMLINSON, Magistrate Judge:**

I.    <u>PRELIMINARY STATEMENT</u>

Plaintiff Molly M. Gentleman (the "Plaintiff"), who suffers from bipolar disorder, commenced this disability discrimination and retaliation action against her former employer, the State University of New York at Stony Brook (the "University" or the "Defendant") and several individuals who worked at the University. *See generally* Complaint ("Compl.") [DE 1]. Following extensive motion practice before the assigned District Judge related to the operative pleadings, the individual defendants were dismissed from this case. *See* November 21, 2016 Memorandum of Decision & Order ("11/21/16 M&O") [DE 35]. Plaintiff subsequently filed a Third Amended Complaint against the University which asserted claims for disability discrimination and retaliation pursuant to the Rehabilitation Act, as well as a claim for breach of contract. *See* Third Amended Complaint ("TAC") [DE 36]. Thereafter, Plaintiff's claim for breach of contract was dismissed but her claims pursuant to the Rehabilitation Act survived. *See* June 6, 2017 Decision & Order ("6/6/17 D&O") [DE 42].

The University has now moved for summary judgment on Plaintiff's two remaining claims under the Rehabilitation Act. *See* Notice of Motion [DE 94]; Defendant's Memorandum

of Law in Support of Motion for Summary Judgment ("Def.'s Mem.") [DE 94]; Defendant's

Reply Memorandum of Law in Further Support of its Motion for Summary Judgment ("Def.'s

Reply") [DE 94-22].  Plaintiff opposes the motion primarily on the grounds that departmental

colleagues were aware of her bipolar disorder and that her request for accommodation was

ignored and/or denied and retaliated against her for engaging in protected activity.  *See generally*

Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment

("Pl.'s Opp'n") [DE 94-13].  The parties have consented to this Court's jurisdiction for purposes

of deciding the University's motion pursuant to 28 U.S.C. § 636(c).  *See* DE 96; January 13,

2021 Electronic Order.  For the reasons which follow, the University's motion for summary

judgment is GRANTED.

II.    **BACKGROUND**

    A.    **Deficiencies in the Parties' Local Rule 56.1 Statements**

        As a preliminary matter, the Court points out that there are many instances in which

Plaintiff failed to properly respond to Defendant's Rule 56.1 Statement.  Plaintiff objects to a

variety of the assertions set forth in that Statement. She does so by using boilerplate language

which does not specifically controvert the University's statements.  For example, Plaintiff lodges

numerous objections on the grounds that the assertions or evidence submitted by the University

"is defective and in violation" of various sections of the Federal Rules of Civil Procedure or the

E.D.N.Y. Local Rules—without citing any evidence in the record which contradicts the

University's statements.  *See, e.g.*, Plaintiff's Responses and Objections to Defendant's Local

Rule 56.1 Statement and Plaintiff's Local Rule 56.1(b) Statement of Material Facts ("Pl.'s 56.1

Stmt.") [DE 94-14] at ¶¶ 3-10, 12, 14-17, 19, 21.  The Court also notes that the University did

not respond to any of the new factual assertions which Plaintiff appended to her Rule 56.1 Statement after she finished responding to the University's.

Local Rule 56.1(c) is clear that "[e]ach numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." (emphasis added).  There is no ambiguity in this provision.  However, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citing *Wight v. Bankamerica Corp.*, 219 F.3d 79, 85 (2d Cir. 2000)).

As a result of the collective failures of counsel, the Court conducted its own review of the record as well as the parties' Local Rule 56.1 Statements and the exhibits submitted.  *See Holtz*, 258 F.3d at 73 (holding that a district court may "opt to 'conduct an assiduous review of the record' even where one of the parties has failed to file [ ] a statement [of fact]") (quoting *Monahan v. New York City Dep't of Corrections*, 214 F.3d 275, 292 (2d Cir. 2000)).  From these documents, the Court references what it considers to be the undisputed facts -- those which are uncontroverted by admissible evidence.  The Court will construe these facts in the light most favorable to the Plaintiff as the non-moving party.  *See Lucente v. County of Suffolk*, 980 F.3d 284, 296 (2d Cir. 2020); *Brandon v. Kinter*, 938 F.3d 21, 31 (2d Cir. 2019); *Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 631 n.12 (2d Cir. 2016); *Beyer v. Cty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008); *Doro v. Sheet Metal Workers' Int'l Ass'n*, 498 F.3d 152, 155 (2d Cir. 2007); *Capobianco v. New York*, 422 F.3d 47, 50 (2d Cir. 2001); *Coastal*

*Pipeline Prod. of New York v. Gonzales*, No. 04 CIV. 8252, 2006 WL 473883, at *4 (S.D.N.Y. Feb. 28, 2006).

    **B.**    **The Undisputed Facts**

        *1.*    *Plaintiff's Term Appointment*

Plaintiff was initially hired by the University for a three-year term appointment as a full-time Assistant Professor in the Department of Materials Science and Engineering, effective September 1, 2012 through August 31, 2015. *See* Plaintiff's Responses and Objections to Defendant's Local Rule 56.1 Statement and Plaintiff's Local Rule 56.1(b) Statement of Material Facts ("Pl.'s 56.1 Stmt.") [DE 94-14] at ¶ 13. A "term appointment" is defined by the State University of New York ("SUNY") Board of Trustees Policies as "an appointment for a specified period of not more than three years which shall automatically expire at the end of that period unless terminated earlier because of resignation, retirement or termination." *Id.* ¶¶ 17-18; State University of New York Policies of the Board of Trustees ("Policies"), annexed as Defendant's Exhibit "E" [DE 94-3 at 30-34]. The reappointment and non-renewal of SUNY employees is subject to the Policies as well as the collective bargaining agreement between the State of New York and the United University Professionals ("UUP"). *See* Pl.'s 56.1 Stmt. ¶¶ 17, 19; Agreement Between United University Professions and the State of New York ("UUP CBA"), annexed as Defendant's Exhibit "F" [DE 94-3 at 36-42]. Section 4 of the Policies states as follows with respect to the renewal of a term appointment:

> Renewal of Term. Except as provided in this Article, term appointments may be renewed by the chief administrative officer of the college for successive periods of not more than three years each; such renewals shall be reported to the Chancellor. No term appointment, of itself, shall he deemed to create any manner of legal right, interest or expectancy in any other appointment or renewal.

*See* Pl.'s 56.1 Stmt. ¶ 20; Policies, Art. XI, Title D, § 4.  If a term appointment is not renewed, the Policies require that the employee be notified within a certain time-period, which, for Plaintiff here, was one year in advance.  *See* Pl.'s 56.1 Stmt. ¶ 21; Policies, Art. XI, Title D, § 5.

### 2.   *The Office of Labor Relations' Investigation and Student Complaints*

During the Spring 2013 semester, less than one year after Plaintiff was hired, Michael Dudley, Chair of the Department of Materials Science and Engineering, and Dilip Gersappe, noticed that nearly half of Plaintiff's graduate students dropped her course and that most of these students were from China.  *See* Pl.'s 56.1 Stmt. ¶ 22; Michael Dudley Declaration ("Dudley Decl.") [DE 94-8] at ¶ 4.  It appeared to Chairperson Dudley that Plaintiff's intimidating behavior in class was causing graduate students to drop her class.  *See* Pl.'s 56.1 Stmt. ¶ 23; Dudley Decl. ¶ 5.  For example, in front of the entire class, Plaintiff accused an academically strong female Asian graduate student of cheating.  *See See* Pl.'s 56.1 Stmt. ¶ 24; Dudley Decl. ¶ 5.  Stating that they felt intimidated by the Plaintiff, these students did not want to go on the record as complaining about the Plaintiff because they feared retaliation and dropped Plaintiff's course instead.  *See* Pl.'s 56.1 Stmt. ¶ 25; Dudley Decl. ¶ 5.  Professor Gersappe spoke to Plaintiff about her teaching style and advised her not to use the Socratic method in classes where there were a lot of Chinese students.  *See* Pl.'s 56.1 Stmt. ¶ 26.  Chairperson Dudley and Professor Gersappe also agreed to restrict Plaintiff's future course offerings to undergraduate classes only because "this was the first time that a faculty member experienced such a steep drop rate with the graduate courses."  *See* Pl.'s 56.1 Stmt. ¶ 28; Dudley Decl. ¶ 6.

In May 2013, Professor Alexander Orlov informed Chairperson Dudley "that Plaintiff had told him that she was so stressed at work that she felt like getting a gun a shooting it."  *See* Pl.'s 56.1 Smt. ¶ 29; Dudley Decl. ¶ 7.  Due to the seriousness of Plaintiff's reported statements,

Chairperson Dudley spoke to Dean Yacov Shamash who directed and accompanied Chairperson Dudley to a meeting with University counsel and University police on May 24, 2013. *See* Pl.'s 56.1 Stmt. ¶ 30; Dudley Decl. ¶ 7. A complaint was filed with the University police that same day. *See* Pl.'s 56.1 Stmt. ¶ 31; Dudley Decl. ¶ 7; May 24, 2013 Incident Report ("5/24/13 Incident Report"), annexed as Defendant's Exhibit "H" [DE 94-3 at 43-47]. The University's Labor Relations Office started an investigation into Plaintiff's statements. *See* Pl.'s 56.1 Stmt. ¶ 32; 5/24/13 Incident Report. The Labor Relations Office collected statements from Professors Orlov and Jason Trelewicz, both of whom were with Plaintiff when she made the statement, and they interviewed Plaintiff herself on June 7, 2013. *See* Pl.'s 56.1 Stmt. ¶ 32; June 7, 2013 Interrogation Statement by Molly Gentleman ("Interrogation Stmt."), annexed as Defendant's Exhibit "K" [DE 94-3 at 54-55].

In his written statement dated May 29, 2013, Professor Orlov said the Plaintiff looked upset and serious when she made the shooting remark. *See* Statement of Alexander Orlov ("Orlov Stmt."), annexed as Defendant's Exhibit "I" [DE 94-3 at 49]. He did not know if Plaintiff made a real threat and was uncomfortable by her comment. *Id.* According to Orlov, Plaintiff "is known to have emotional mood swings" and she was struggling to obtain funding. *Id.* "When she discusses it, she goes from smiling optimistically to crying, which is not typical behavior in the workplace." *Id.* Professor Orlov then made additional comments regarding Plaintiff's mental health and expressed his concerns about working with her:

> I do try to avoid her because I did think what she said was outrageous and I question her judgment. I am concerned about working with her, given her emotional instability and the fact that she likely knows that I made this report. There are plans for her students and Jason's students and my students to share a large space and I am concerned about interacting with her. I am not as much concerned about my safety as much as dealing with her emotional reactions. I am hoping the situation calms down and nothing comes

6

of it.  I don't want to harm her professionally.  I didn't realize it would precipitate the police investigating.

*Id.*

Professor Trelewicz's written statement is also dated May 29, 2013.  *See* Statement of Jason Trelewicz ("Trelewicz Stmt."), annexed as Defendant's Exhibit "J" [DE 94-3 at 51-52]. Similar to Professor Orlov, Professor Trelewicz felt uncomfortable after Plaintiff made the shooting comment, but he did not think to report it.  *See id.* at 1.  He told Plaintiff that he hoped he was on her "good list" and that she would let him know the day she "does it" so he can stay home.  *Id.*

After that conversation, Professor Trelewicz' relationship with Plaintiff deteriorated -- though it had nothing to do with her shooting remark.  *Id.*  Professor Trelewicz stated that Plaintiff "yells at her grad students and puts them down.  She's very emotional and cried multiple times in front of me."  *Id.*  He described a particular situation that transpired between him and Plaintiff when a visiting professor from Germany was at the University:

> On or about May 8, 2013, we had a visiting professor from Germany that was invited by the Dept. who I will be collaborating with.  I had plans to go to lunch with him.  [Plaintiff] came into my office while I was on the phone.  I told her I'd see her when I got off the phone. I stayed at the doorway to her office while she was seated at her desk.  She told me she was coming to lunch with me and the professor because she had been given no time with him and that she had a very busy afternoon.  I said let me check . . . to see if he's available now for Molly to show him her lab because the lunch meeting was the only time I would have to talk with him about our collaboration and because she was busy in the afternoon. . . .  [S]he could have 25 minutes . . . right then.  I went to tell her again at her doorway and said he'll be here in 2 minutes so you can meet with him until noon and you don't have to worry about lunch since you're busy.  At that point she stood up and yelled at me, "you know Jason, if you don't want me to come to lunch with you just say so!"  She appeared very angry.  I replied words to the effect, "Please don't speak to me that way.  I was trying to be nice.  You're welcome to come to lunch with us."  Alan Greene, who sits in the office between us, did say . . . "It's ok Jason, you're always nice."

*Id.* In the two weeks that followed, Plaintiff declined Professor Trelewicz's invitations to join him to get coffee or snacks. *Id.* When he tried to clear the air by visiting Plaintiff in her office, he apologized for raising his voice and bringing any emotion to the exchange. *Id.* Plaintiff said "Honestly Jason, I don't know what to do with you. You got violent and physical, your face got red and your fists were clenched." *Id.* Professor Trelewicz did not know what Plaintiff was referring to and noted the seriousness of her allegation. *Id.* Plaintiff then began to cry and told Professor Trelewicz that he was the only one who had been a consistent friend to her but that he had a tendency to bully her. *Id.* at 1-2. Lastly, Professor Trelewicz noted that on the day he wrote his statement, he returned a textbook to Plaintiff in her office and she slammed her office door on him, nearly closing it on his hand. *Id.* at 2.

In Plaintiff's Interrogation Statement and during her deposition, Plaintiff described the context of the conversation in which she made the remark that instigated the Labor Relations investigation:

> Jason [Trelewicz] was angry and complaining about lab space and Alex [Orlov] complained he didn't have enough lab space. Then the discussion moved onto the topic of the Boston bombing and I was upset because my friend was close to it. Jason was making negative comments about MIT, about how people kill themselves at MIT & how the shooting took place at MIT. I was uncomfortable so to lighten the mood, I made the comment to the effect, that if I was going to do something like that I would call you guys or e-mail you guys to stay home that day. They both laughed and Alex said, "Thanks!" Jason left to go do something and Alex and I remained talking. We talked another 2-3 minutes. It's not like I said this and they ran away in fear. That was the last time I heard about that event. We remained friends after that. I have multiple e-mails showing that we remained friendly.

*See* Interrogation Stmt. at 1. Plaintiff testified that she never referred to a gun, firearm, or any weapon during this conversation and that she has never had a gun permit or license. *See* Molly Gentleman Deposition Transcript ("Gentleman Tr.") [DE 94-16] at 24, annexed as Ex. "1" to the

Declaration of Assistant Attorney General Toni Logue in Support of Defendant's Motion for

Summary Judgment ("Logue Decl.") [DE 94-1].  During this same conversation, Plaintiff also

described Professor Orlov and Trelewicz as being angry because a female lecturer named

Tatiana was hired in their department and "her start-up was the same size" as Professor

Trelewicz's.  *Id.*

Plaintiff also recalled her interactions with Professor Trelewicz related to the visiting

professor:

> Jason and I were supposed to take the visitor to lunch together.
> Jason got territorial and told me I didn't need to come to lunch with
> him and their [sic] won't be time to talk to the visitor because he
> needed to have a technical talk with him.  I called him out on it
> because I felt the guy wanted to meet with me.  I said to him in an
> exasperated tone, "What, do you not want me to go to lunch with
> you?  Because you've told me 4 times I didn't need to come and
> there wouldn't be time to talk with him?["]  He responded very
> negatively, in a physical way, he was clenching his fist, his face got
> red, I was sitting at my desk, he was in my doorway.  He left and I
> immediately went to my mentor . . . and said I was upset at how
> Jason responded and that I wouldn't be joining them for lunch.

*See* Interrogation Stmt. at 1.  In her subsequent conversation with Professor Trelewicz, Plaintiff

said Trelewicz responded the way he did because Plaintiff is "an aggressive person in general."

*Id.* at 2.  Plaintiff thought this was a sexist comment and an example of "studies [which] show

men in Engineering belittle women."  *Id.*  Plaintiff spoke to her mentor as well as the "Dept.

Head of Civil, Harold" because Harold had a lot of experience dealing with gender roles in

engineering.  *Id.*  Harold told Plaintiff this "sounded like a gender issue" and made Plaintiff feel

better.  *Id.*  Plaintiff then stated that she felt her issues with Professor Trelewicz were resolved

but that he stopped talking to her and she "didn't have time to investigate."  *Id.*  Later on during

May 2013, Plaintiff noted that she had a discussion with Professors Orlov and Trelewicz about

sharing office space which "went very well."  *Id.*  However, after their exchange regarding the

shared office space, police interviewed Plaintiff on May 28, 2013 about her gun statement. *Id.* She thought Professors Orlov and Trelewicz retaliated against her "because they were both angry . . . over minor incidents." *Id.* Plaintiff did not think that the two Professors thought their complaints "would get this far." *Id.*

As a result of the investigation, the University's Labor Relations Office issued Plaintiff a written counseling dated September 5, 2013 "for making comments that could be construed as violating the University's Policies on Disruptive Behavior and/or Workplace Violence." Pl.'s 56.1 Stmt. ¶ 34; Counseling Letter ("Counseling Ltr."), annexed as Defendant's Exhibit "L" [DE 94-3 at 57]. According to the counseling letter, the Labor Relations Office determined that Plaintiff did not appear to be serious when she made the comment and was put on notice that such comments should not be made in view of recent violent events on campuses. *See* Counseling Ltr.

On June 17, 2013, Plaintiff filed an internal complaint with the University's Office of Diversity and Affirmative Action ("ODAA"), alleging that she was subjected to a hostile work environment on the basis of her gender. *See* Pl.'s 56.1 Stmt. ¶ 37; ODAA Complaint Intake & Information Sheet ("ODAA Complaint"), annexed as Defendant's Exhibit "O" [DE 94-4 at 2-4]. According to the ODAA Complaint, Plaintiff stated that she was being discriminated against on the basis of gender and subjected to sexual harassment by Professors Trelewicz and Orlov. *See* ODAA Complaint at 13-14: "Jason [is] telling colleagues that I am aggressive and threatening personal violence against him. Alex & Jason had false police report filed against me to humiliate me in front of colleagues. Jason continues to spread rumors." *Id.* at 14. Plaintiff's allegations of harassment referred to incidents of workplace disagreements about office and laboratory space and meetings with visiting colleagues. *See* Pl.'s 56.1 Stmt. ¶ 39. Plaintiff previously exchanged

10

emails with Professors Orlov and Trelewicz in which they "civilly discuss[ed] how to share the reduced laboratory space." *Id.* ¶ 40.  Plaintiff's ODAA Complaint was investigated and statements were taken from Plaintiff and the other two Professors.  *Id.* ¶ 41.  No evidence of discrimination was found and the case was closed by the ODAA.  *Id.* ¶ 42.

### 3.      *The Non-Renewal of Plaintiff's Term Appointment*

When Plaintiff's term appointment was coming up for review, Chandrani Roy, Assistant to Chairperson Dudley, asked Plaintiff to submit an updated CV and a statement about her teaching, research, and service to the University community.  *Id.* ¶ 43.  During the Fall 2014 semester, Chairperson Dudley and Ms. Roy received complaints from numerous students about Plaintiff's unprofessional and unacceptable behavior towards students.  *Id.* ¶ 44.  Chairperson Dudley, Ms. Roy, and Professor Gary Halada, the Director of Undergraduate Studies, met with some of these students in a group.  *Id.* ¶ 45; Dudley Decl. ¶¶ 12-13.  Ms. Roy drafted minutes of this meeting which was held on October 29, 2014.  *See* Dudley Decl. ¶ 13; Minutes of October 29, 2014 Meeting ("10/29/14 Minutes"), annexed as Defendant's Exhibit "U" [DE 94-4 at 23-26].  At that meeting, several students complained about Plaintiff creating a "fear-ridden environment," demeaning, verbally attacking and publicly shaming students, and also falsely accusing students of cheating in front of their peers.  *See* Pl.'s 56.1 Stmt. ¶ 47; 10/29/14 Minutes. The students described a particular incident that transpired after Plaintiff handed back their midterm exams:

> While handing out our midterm exams back some students were given green stars on their exams.  After distributing the whole set of exams, the students who got the stars were asked to raise their hands. The[n] she accused those students of cheating in the exams as they had really good scores on the quizzes and did really bad on the midterm.  She asked all students in the class to look around for these students who have their hands raised and told them not to sit next to

> these students as these kids cheat in class.  There was no evidence
> of these students cheating and it was just an assumption.

10/29/14 Minutes at 1; *see* Pl.'s 56.1 Stmt. ¶ 48.

A few weeks later on November 7, 2014, a "Department Tenure and Promotion" meeting

was held with all tenured faculty members to discuss the possible appointment of three assistant

professors, including Plaintiff.  *See* Pl.'s 56.1 Stmt. ¶ 49; Dudley Decl. ¶ 16.  During this

meeting, Chairperson Dudley raised the numerous complaints from students regarding Plaintiff's

behavior towards them.  *See* Pl.'s 56.1 Stmt. ¶ 50; Dudley Decl. ¶ 16.  According to Chairperson

Dudley,

> [b]ased on the complaints from Plaintiff's students relating to
> failures in Plaintiff's teaching performance, including abusive and
> disrespectful classroom conduct and public shaming of students, and
> based on meetings with colleagues and administrators, including
> one that occurred on November 11, 2014, and that incorporated the
> input of Dilip Gersappe, Gary Halada, Lynn Johnson (Director of
> Human Resources) and Tracy Haas (Employee and Labor
> Relations), among others, I decided that Plaintiff's term
> appointment should not be renewed.

*See* Dudley Decl. ¶ 17.  On November 14, 2014, while accompanied by Tracey McEachern,

Assistant Director of Human Resource Services, Chairperson Dudley notified Plaintiff of the

non-renewal of her term appointment, thereby affording Plaintiff the one-year notice period as

required by the Policies and UUP CBA.  *See* Pl.'s 56.1 Stmt. ¶ 18; Dudley Decl. ¶ 18.

After she was notified of the non-renewal decision, Plaintiff admitted that, during a

meeting with the Vice Provost in March 2015, she threatened to file a New York State Division

of Human Rights ("NYSDHR") complaint if the University did not revoke the non-renewal

notice.  *See* Pl.'s 56.1 Stmt. ¶ 54; Gentleman Tr. at 91.  During a subsequent meeting Plaintiff

had in May 2015, the Vice Provost offered to extend the effective date of the non-renewal to

January 6, 2016.  *See* Pl.'s 56.1 Stmt. ¶ 55.[1]  Plaintiff was sent a letter dated July 23, 2015 by

Carol Mord, Director of Human Resource Services, which formally offered Plaintiff the

extension of her non-renewal date and included a letter of agreement.  *See* July 23, 2015 Letter

("7/23/2015 Ltr."), annexed as Defendant's Ex. "X" [DE 94-5 at 8-11].  Plaintiff refused to sign

the letter of agreement and declined the Vice Provost's offer.  *See* Pl.'s 56.1 Stmt. ¶ 57;

Gentleman Tr. at 51-52.

The next day, July 24, 2015, Plaintiff filed a NYSDHR complaint with the assistance of

counsel, alleging disability discrimination.  *See* Pl.'s 56.1 Stmt. ¶ 58; New York State Division

of Human Rights Complaint Form ("NYSDHR Compl."), annexed as Defendant's Ex. "Y"

[DE 94-6].  In the NYSDHR complaint, Plaintiff stated that she suffers from bipolar disorder,

and that because of her disability, she was fired, harassed (but not sexually harassed), and denied

an accommodation for her disability.  *See* NYSDHR Compl. at 6.  During Plaintiff's

employment, the University had a Department of Disability Support Services ("DSS") which

assisted employees and students with disabilities.  *See* Pl.'s 56.1 Stmt. ¶ 60; Lynn Johnson

Declaration ("Johnson Decl."), annexed as Defendant's Ex. "Z" [DE 94-9] at ¶ 16. According to

Marjolie Leonard, the Senior Director of the Office of Institutional Diversity and Equity

("OIDE"), Plaintiff never made an internal complaint of disability discrimination before she was

notified of the non-renewal of her term appointment.  *See* Declaration of Marjolie Leonard

("Leonard Decl.") [DE 94-10] at ¶ 5.

---

[1]     Plaintiff asserts that a document titled "Talking Points – M.G." was created as a script for the University to utilize during this May 2015 meeting "to obfuscate" and "prevent the plaintiff from knowing the reason for the defendant's termination of the plaintiff's employment." *See* Pl.'s 56.1 Stmt. ¶¶ 94-99.  It is not clear if this script was even utilized during the aforementioned meeting nor has the Plaintiff submitted or cited to any corroborating evidence to support the assertion that the script was intended to conceal the University's rationale for its non-renewal of Plaintiff's appointment.

### C.      The Disputed Facts

The University asserts that Plaintiff never disclosed that she suffered from bipolar disorder.  *See* Pl.'s 56.1 Stmt. ¶ 61; Johnson Decl. ¶ 17.  According to Ms. Johnson, the Human Resources Director, Plaintiff did not notify nor submit any documentation regarding her mental health condition to DSS or a Human Resource Officer, nor did Plaintiff request any accommodations due to her mental health condition.  *See* Johnson Decl. ¶ 17.  On the other hand, Plaintiff testified that she informed Chairperson Dudley and Professor Miriam Rafailovich that she was bipolar.  *See* Gentleman Tr. at 66-68; Pl.'s 56.1 Stmt. ¶¶ 68-69.  Plaintiff refers to her NYSDHR Complaint in which she states that she was having significant challenges working with the department administrator, Ms. Roy, who did not include Plaintiff in department emails nor provide Plaintiff with other information to enable her to do her job.  *See* NYSDHR Compl. at MG-289.  Plaintiff claims that she complained of Ms. Roy's conduct to Chairperson Dudley, explained her disability "and the need for him to intercede among other accommodations such as providing [her] with an agenda/topic for all meetings at the time of scheduling."  *Id.*  Plaintiff's also asserts that she disclosed her disability to Professor Rafailovich when she sought her assistance in dealing with Ms. Roy.  *Id.*; *see* Pl.'s 56.1 Stmt. ¶¶ 68-69; Gentleman Tr. at 74-76.

### D.      Relevant Procedural Background

Plaintiff commenced this action against the University, Michael Dudley, Chandrani Roy, Jason Relewicz, and Alexander Orlov on April 25, 2016.  *See generally* Compl.  Plaintiff filed an Amended Complaint as of right on May 1, 2016 against the same defendants, asserting ADA claims for discrimination and retaliation as well as claims under 42 U.S.C. § 1983 for due process violations and retaliation.  *See generally* Amended Complaint ("Am. Compl.") [DE 11].  Defendants moved to dismiss the Amended Complaint in its entirety.  *See* DE 20.  In opposition

to Defendants' motion to dismiss, Plaintiff filed a proposed second amended complaint ("SAC").
*See* DE 21; DE 22; DE 23.  Judge Spatt construed the proposed SAC as a cross-motion for leave
to amend and deemed Defendants' motion to dismiss as one directed to the SAC.  *See* 11/21/16
M&O at 7.   The SAC was "materially indistinguishable from the amended complaint, except
that the Plaintiff's claims based on violations of the ADA [were] replaced by identical claims
under the Rehabilitation Act." *Id.* at 5.  A breach of contract claim was also asserted.  *Id.*  Judge
Spatt dismissed Plaintiff's § 1983 claims as well as all claims against the individual defendants.
*See id.* at 24.  Plaintiff's claims under the Rehabilitation Act and for breach of contract were
permitted to proceed and Plaintiff was granted leave to file a Third Amended Complaint
("TAC").  *Id.*  Judge Spatt noted that the SAC failed to specifically allege that the University
received federal funding during the relevant time period -- an element required to maintain a
cause of action under the Rehabilitation Act -- and permitted Plaintiff to file a TAC for the
limited purpose of incorporating such an allegation.  *See* 6/6/17 D&O at 2.

On December 9, 2016, Plaintiff filed the TAC in accordance with Judge Spatt's directive.
*See generally* TAC.  The University filed a second motion to dismiss on December 23, 2016.
*See* DE 38.  On June 6, 2017, Judge Spatt denied the University's motion as to Plaintiff's two
Rehabilitation Act claims for discrimination and retaliation, but granted the motion as to the
breach of contract claim.  *See* 6/6/17 D&O at 12.  The University filed an Answer to the TAC on
June 21, 2017.  *See generally* Answer [DE 45].

Pending resolution of the issues related to the operative pleading, with the exception of
Rule 26 Initial Disclosures and requests for documents and interrogatories, all other discovery,
including depositions, was stayed.  *See* July 14, 2016 Civil Conference Minute Order [DE 29].
Following Judge Spatt's June 2017 decision, this Court implemented an Amended Final

Scheduling Order which included dates for the parties to serve their Rule 56.1 Statements and a deadline for the parties to file letter requests to Judge Spatt for purposes of moving for summary judgment. *See* July 26, 2017 Civil Conference Minute Order [DE 46]. On February 26, 2018, the Court (1) certified that discovery was closed, (2) found that the parties' Amended Proposed Joint Pre-Trial Order substantially complied with Judge Spatt's requirements, and (3) deemed this case ready for trial. *See* February 26, 2018 Electronic Order. No pre-motion conference requests for purposes of moving for summary judgment were filed by that date. Judge Spatt then scheduled the trial of this action for March 25, 2019, a date which was adjourned several times. *See* September 5, 2018 Electronic Order; March 4, 2019 Electronic Order. Prior to the September 23, 2019 trial date, the University, for the first time on January 11, 2019, requested a pre-motion conference for purposes of moving for summary judgment. *See* DE 63. Judge Spatt denied the University's request. *See* DE 66.

On September 17, 2019, Judge Spatt recused himself and this case was reassigned to Judge Azrack. *See* DE 87. Judge Azrack cancelled the trial and permitted the University to file a motion for summary judgment. *See* September 18, 2019 Minute Entry; November 15, 2019 Electronic Order. The University's motion was filed fully briefed on March 16, 2020. *See* DE 94. Judge Azrack referred the motion to this Court for a Report and Recommendation on December 11, 2020. On January 9, 2021, the parties consented to this Court's jurisdiction for purposes of ruling on the University's motion. *See* DE 96; January 13, 2021 Electronic Order.

## III.   STANDARD OF REVIEW

Rule 56(a) of the Federal Rules of Civil Procedure provides that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the initial

burden of establishing the absence of any genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Mihalik v. Credit Agricole Cheuvreux North America, Inc.*, 715 F.3d 102, 108 (2d Cir. 2013); *Holcomb v. Iona Coll.*, 521 F. 3d 130, 137 (2d Cir. 2008). To determine whether the moving party has satisfied this burden, the Court is required to view the evidence and all factual inferences arising from that evidence in the light most favorable to the non-moving party. *Doro v. Sheet Metal Workers' Int'l Ass'n*, 498 F.3d 152, 155 (2d Cir. 2007); *Woodman v. WWOR-TV, Inc.*, 411 F. 3d 69, 75 (2d Cir. 2005). In dispatching this task, a court need only consider admissible evidence. *Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013) (quoting *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997); *Hilaire*, 54 F. Supp. 3d at 251.

Where the movant shows a *prima facie* entitlement to summary judgment, "the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006); *Miller v. Nassau Health Care Corp.*, No. 09-CV-5128, 2012 WL 2847565, at *3 (E.D.N.Y. July 11, 2012). "[T]he nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment." *Salahuddin*, 467 F. 3d at 273; *see McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment."); *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 101 (2d Cir. 2001) ("Even where facts are disputed, in order to defeat summary judgment, the non-moving party must offer enough evidence to enable a reasonable jury to return a verdict in its favor."). Summary judgment is mandated if the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986);

*see Dobbs v. Dobbs*, No. 06-CV-6104, 2008 WL 3843528, at *5 (S.D.N.Y. Aug. 14, 2008) ("The Court's goal should be to isolate and dispose of factually unsupported claims.") (internal quotation marks omitted).

## IV.   DISCUSSION

### A.   Count I:  Disability Discrimination under the Rehabilitation Act

Section 504 of the Rehabilitation Act provides, in relevant part, that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.'" *T.W. v. N.Y. State Bd. of Law Examiners*, No. 16-CV-3029, 2019 WL 4468081, at * 1 (E.D.N.Y. Sept. 18, 2019) (quoting 29 U.S.C. § 794(a)).  Thus, to survive a motion for summary judgment, a plaintiff bears the burden of establishing a *prima facie* claim of employment discrimination under the Rehabilitation Act.  *See Veldran v. Brennan*, 408 F. Supp. 3d 111, 114-14 (E.D.N.Y. 2019).  To do so, a plaintiff must demonstrate:  "(1) that [s]he is an individual with a disability within the meaning of the statute, (2) that [s]he was otherwise qualified for the position or benefit denied, (3) that [s]he suffered an adverse employment action because of [her] disability; and (4) the program sponsoring [her] position receives federal funding."  *See De Figueroa v. New York*, 403 F. Supp. 3d 133, 160 (E.D.N.Y. 2019) (quoting *Day v. MTA N.Y.C. Transit Auth.*, No. 17-CV-07270, 2019 WL 1437616, at *4 (S.D.N.Y. Mar. 31, 2019)).  "Failure to establish even one of these four elements 'is fatal to a claim of employment discrimination.'"  *Veldran*, 408 F. Supp. 3d at 115 (quoting *Reidy* v. *Runyon*, 971 F. Supp. 760, 768 (E.D.N.Y. 1997)).

### 1.     *Element One:  Whether Plaintiff is an Individual with a Disability*

To be deemed "disabled," a plaintiff must:  "(1) have a physical or mental impairment which substantially limits one or more of such person's major life activities; (2) have a record of such an impairment; or (3) be regarded as having such an impairment." *Id.* at 115 (citing *Gentile v. Potter*, 509 F. Supp. 2d 221, 235-36 (E.D.N.Y. 2007)).  The University argues that "[t]he sole issue is whether Plaintiff was subjected to discriminatory treatment because she was regarded as having a disabling mental impairment." *See* Def.'s Mem. at 7.  The University contends that the only evidence Plaintiff submitted to demonstrate that she was regarded as having an impairment is her own deposition testimony, in which she states that she informed Department Chairperson Dudley of her disability in 2012. *See id.*  According to the University, "Plaintiff does not point to any pejorative comments by any of Defendant's employees about mental health  issues generally, or about Plaintiff's mental state specifically.  She does not offer evidence that she was treated differently because co-workers regarded her as having a disabling impairment." *Id.*

Plaintiff on the other hand maintains that she meets all three prongs of the test to be deemed disabled. *See* Pl.'s Opp'n at 14.  Plaintiff argues that she has a physical and mental impairment, namely, bipolar disorder, which substantially limits one or more of her major life activities. *See id.* at 14-15.  In support of this argument, Plaintiff references medical records which disclose her diagnosis as "Unspecified Bipolar and Related Disorder." *Id.* at 15.  Plaintiff then contends that she was "regarded as having an impairment" because she discussed her bipolar disorder with Chairperson Dudley. *Id.*  After Plaintiff informed Chairperson Dudley of her diagnosis, she asserts that "[i]t soon became . . . common knowledge within the department that Plaintiff is a person with bipolar disorder." *Id.* (citing Gentleman Tr. at 67-68).  Plaintiff

also states that Professor Rafailovich regarded her as having a disability and assisted her when she was having issues with Ms. Roy. *Id.* (citing Gentleman Tr. at 74-76).[2]

Here, Plaintiff's disability fails to survive the test for an impairment which substantially limits any major life activity. Major life activities include "caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Veldran*, 408 F. Supp. 3d at 115 (citing 45 C.F.R. § 84.3(j)(2)(ii)). In her opposition, Plaintiff generally asserts that her bipolar disorder "substantially limits one or more of the major life activities" without elaborating or pointing to any evidence in the record to corroborate that statement. *See* Pl.'s Opp'n at 14-15. Plaintiff does not even raise an argument that her bipolar disorder limited, let alone substantially limited, her ability to work at the University. Were the Court to consider that argument, the record is nonetheless clear that even if Plaintiff suffered from bipolar disorder

---

[2]    Plaintiff also raises an argument that a "cat's paw theory of liability" applies to her employment discrimination claim. *See* Pl.'s Opp'n at 16-17. Cat's paw liability "refers to a situation in which an employee is fired or subjected to some other adverse employment action by a supervisor who himself has no discriminatory motive, but who has been manipulated by a subordinate who does have such a motive and intended to bring about the adverse employment action." *Natofsky v. City of New York*, No. 14 CIV. 5498, 2017 WL 3670037, at *12 (S.D.N.Y. Aug. 8, 2017) (quoting *Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 272 (2d Cir. 2016)), *aff'd on other grounds,* 921 F.3d 337 (2d Cir. 2019). However, "an employer who, non-negligently and in good faith, relies on a false and malign report of an employee who acted out of unlawful animus cannot, under this cat's paw theory, be held accountable for or said to have been 'motivated' by the employee's animus." *Id.* (quoting *Vasquez*, 835 F.3d at 275). Here, the cases to which Plaintiff refers discuss cat's paw liability pursuant to the Uniformed Service Employment and Reemployment Rights Act of 1994 or Title VII. *See* Pl.'s Opp'n at 16-17. Plaintiff has not cited a single case which extends cat's paw liability to claims arising under the Rehabilitation Act and the Court declines to do so here. *See Natofsky*, 2017 WL 3670037, at *12 ("[W]e doubt that cat's paw liability could be extended into the Rehabilitation Act . . . ."); *see also Zuro v. Town of Darien*, 432 F. Supp. 3d 116, 129 (D. Conn. 2020) ("[D]istrict courts within this circuit have indicated that the cat's paw theory does not apply to the Rehabilitation Act because, unlike Title VII cases, the Rehabilitation Act requires a stricter but-for causation analysis.").

from the outset of her term appointment at the University, she continued to work throughout that

time period.  "Merely having an impairment does not make one disabled."  *Veldran*, 408 F.

Supp. 3d at 115 (quoting *Toyota Motor Mfg., Ky. Inc. v. Williams*, 534 U.S. 184, 194 (2002));

*see also Schimkewitsch v. New York Inst. of Tech.*, No. CV 19-5199, 2020 WL 3000483, at *4

(E.D.N.Y. June 4, 2020) ("[C]ourts have been careful to distinguish impairments which merely

*affect* major life activities from those that *substantially limit* those activities." (quoting *Ryan &*

*Grae v. Rybicki, P.C.*, 135 F.3d 867, 870 (2d Cir. 1998)).  Accordingly, Plaintiff has not

established that a major life activity was substantially limited by her bipolar disorder.

Plaintiff is also unable to demonstrate that she was "regarded as having an impairment"

by the University.  An individual is regarded as having an impairment if she:  "(1) has a physical

or mental impairment that does not substantially limit major life activities but is treated by an

employer as constituting such a limitation; (2) has an impairment that substantially limits major

life activities only as a result of the attitudes of others toward such impairment; or (3) has none

of the impairments but is treated by an employer as having a substantially limiting impairment."

*Id.* at 117 (citing 29 C.F.R. § 1630.2(7)).  "'Without knowledge of [a plaintiff's] disability, it is

logically impossible' for an employer to discriminate against a plaintiff as a result of [her]

disability." *Id.* (quoting *Pace v. Paris Maintenance Co.*, 107 F. Supp. 2d 251, 262 (S.D.N.Y.

2000)).  As to Plaintiff's contention that the University regarded her as having a disability

because she informed Chairperson Dudley and Professor Rafailovich of her diagnosis, a plaintiff

must prove more than an employer's simple awareness of an employee's impairment.  *See id.*;

*see also Schimkewitsch*, 2020 WL 3000483, at *5 ("A person is regarded as having an

impairment if he or she establishes that he or she has been subjected to an action prohibited

under [the ADA] because of an actual or perceived physical or mental impairment whether or not

21

the impairment limits or is perceived to limit a major life activity.  This inquiry turns on the employer's perception of the employee and is therefore a question of intent, not whether the employee has a disability."); *McFarlane v. Chao*, No. 04 CV 4871, 2007 WL 1017604, at *16 (S.D.N.Y. Mar. 30, 2007) ("[T]he mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that that perception caused the adverse employment action.").  The University submits that it did not learn that Plaintiff suffered from bipolar disorder until she filed her NYSDHR complaint in July 2015, which was eight months after she was notified of her non-renewal.  *See* Def.'s Mem. at 10.  Thus, even if the Court were to credit Plaintiff's own testimony that she informed Chairperson Dudley and Professor Rafailovich of her bipolar diagnosis, Plaintiff has not advanced any evidence which would suggest that the University regarded her as having a disability under the Act.

Plaintiff seems to suggest that because she was described by co-workers as being "emotional," known to cry, and even emotionally unstable, that she was regarded as having a disability.  *See* Pl.'s Opp'n at 16.  However, Plaintiff admitted during her deposition that none of these individuals informed Plaintiff that they knew she was bipolar, nor has Plaintiff provided evidence that they knew of her diagnosis.  *See* Gentleman Tr. at 68 ("So no one came up to me and said hey, I heard you're bipolar, but -- you know, subtle questions about my mental health . . . .  People who had never seen me have an upset interaction with anyone would tell me oh, I hear that you have trouble getting upset at work . . . .").[3]  As such, nothing in the record

---

[3]     In his June 2017 Decision & Order, Judge Spatt found that the Plaintiff plausibly stated a claim for discrimination because she alleged that (1) Chairman Dudley, Ms. Roy, and Professors Trelewicz and Orlov knew of her bipolar diagnosis since Fall 2012, (2) Chairman Dudley made remarks that indicated he believed Plaintiff's diagnosis rendered her unable to meet the requirements of her position, (3) Chairman Dudley acted in concert with Ms. Roy and

demonstrates that the University, through Plaintiff's apparent supervisor Dudley or even through her colleagues, regarded her as having a disability due to her bipolar disorder.

Accordingly, drawing all reasonable inferences in favor of Plaintiff, the Court is unable to conclude that she was under a disability or was regarded as having a disability as defined by the Rehabilitation Act. The University's motion for summary judgment is therefore GRANTED as to Count I of the Third Amended Complaint.

### B.      Count II:  Retaliation under the Rehabilitation Act

To demonstrate a *prima facie* case for retaliation under the Rehabilitation Act, a plaintiff must show that:  (1) he or she engaged in protected activity; (2) the employer was aware of this activity; (3) the plaintiff was subjected to an adverse employment action; and (4) a causal connection existed between the alleged adverse employment action and the protected activity. *See Dickson v. N.Y. State Office of Children & Family Servs.*, 453 F. Supp. 3d 587, 593 (E.D.N.Y. 2020) (citing *Warmin v. N.Y. City Dep't of Educ.*, No. 16 Civ. 8044, 2019 WL 3409900, at *7 (S.D.N.Y. July 20, 2019)). Once an employee establishes a *prima facie* case, "the burden shifts to the employer to put forth evidence of a non-retaliatory rationale." *Cox v. Onondaga County Sheriff's Dep't*, 760 F.3d 139, 145 (2d Cir. 2014) (citing *Holt v. KMI-*

---

Professors Trelewicz and Orlov to make a false police report that indicated Plaintiff was "suffering from a mental disorder that was likely to cause self-harm and harm to others," (4) the University decided not to renew Plaintiff's term appointment because of the report that Plaintiff was dangerous "because of her . . . perceived disability," (5) Plaintiff was effectively terminated due to the "stigma associated with her disability," and (6) SUNY terminated Plaintiff's employment because she was perceived as having a disability. *See* 6/6/2017 D&O at 6-7. Although Judge Spatt accepted those allegations as true for purposes of ruling on and denying the University's motion to dismiss, the case has moved forward now to the summary judgment stage where the allegations are no longer accepted at face value and where Plaintiff has to set forth sufficient evidence to establish a *prima facie* case and lay bare disputed material facts sufficient to overcome the University's press for summary judgment as to Plaintiff's discrimination claim.

*Continental*, 95 F.3d 123, 130 (2d. Cir. 1996)).  "Once the employer has done so, the employee

may prevail by demonstrating that the stated rationale is mere pretext."  *Id.* (citing *Jute v.*

*Hamilton Sundstrand Corp.*, 420 F.3d 166, 173, 179-80 (2d Cir. 2005)).

The University first argues that Plaintiff has failed to demonstrate any direct or indirect

evidence of retaliatory animus.  *See* Def.'s Mem. at 12.  The University asserts that Plaintiff was

hired for a three-year term that could or could not be renewed pursuant to SUNY Policies.  *Id.* at

12-13.  However, according to the University, the decision not to renew Plaintiff's appointment

was made after numerous complaints were received from students regarding "Plaintiff's

unprofessional and unacceptable behavior towards them[] during the Fall 2014 semester."  *Id.*

at 13.  The University also cites the voluntary course evaluations submitted by Plaintiff's

students at the end of that semester which contributed to the decision not to renew Plaintiff's

appointment.  *Id.* at 14.  Next, the University argues that Plaintiff has not demonstrated any

causal connection between her protected activity and the adverse employment action.  *Id.* at 15.

In particular, the University contends that the time between the filing of Plaintiff's internal

ODAA Complaint on June 17, 2013 and the non-renewal determination issued on November 14,

2014 is too remote to demonstrate a causal connection.  *See id.*

In response to the University's causation argument, Plaintiff contends that during the

interim period between the filing of her ODAA Complaint and notice of non-renewal, she was

subjected "to a review and other adverse actions with respect to compiling evidence of her

inability to teach."  *Id.* at 21.[4]  Plaintiff contends that the information the University utilized to

---

[4]      Plaintiff has objected to the admissibility of the October 29, 2014 Meeting
Minutes as hearsay pursuant to Federal Rule of Evidence 801 because it "appears to be a report
about the plaintiff's poor performance that is not dated, not signed, and the declarants are not
identified."  *See* Pl.'s Opp'n at 21-22.  Although the University has taken no position on this
objection, the Minutes were drafted by Ms. Roy, who was in attendance at the meeting, within

substantiate the decision not to renew her was not shared with her and deprived her of any

opportunity to improve her purported teaching weakness.  *Id.* at 22.  Plaintiff further claims that

"the Vice Provost for Faculty Affair[s], the Director, Employee, the Assistant Direct [sic],

Human Resources Services and Dudley made sure not to discuss the reasons behind their

decision to terminate the plaintiff's employment."  *Id.* at 22-23.  Thus, based upon the parties'

arguments, it does not appear that the first three elements are in dispute.  As such, the Court will

focus its inquiry on the fourth element, namely, whether Plaintiff has established a causal

connection between the protected activity and the adverse action.

"A causal connection in retaliation claims can be shown either '(1) indirectly, by showing

that the protected activity was followed closely by discriminatory treatment, or through other

circumstantial evidence such as disparate treatment of fellow employees who engaged in similar

conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by

the defendant.'"  *Dickson*, 453 F. Supp. 3d at 593-94 (quoting *Natofsky v. City of New York*, 921

F.3d 337, 353 (2d Cir. 2019)).  The Second Circuit has recognized:

> [E]mployment discrimination is often accomplished by discreet
> manipulations and hidden under a veil of self-declared innocence.
> An employer who discriminates is unlikely to leave a "smoking
> gun," such as a notation in an employee's personnel file, attesting to
> a discriminatory intent.  A victim of discrimination is therefore
> seldom able to prove his or her claim by direct evidence and is

_____

one day of the meeting's conclusion.  *See* Dudley Decl. ¶ 13.  It is appropriate for district courts
to decide questions regarding the admissibility of evidence on summary judgment.  *See Lara v.
Delta Int'l Machinery Corp.*, 174 F. Supp. 3d 719, 727 (E.D.N.Y. 2016).  Accordingly,
Plaintiff's objection is overruled.  Plaintiff then appears to object to "Exhibits G, W, and Z," as
hearsay without articulating any substantial basis for the objection.  *See* Pl.'s Opp'n at 22.  These
three exhibits were not shared with Plaintiff during discovery and Plaintiff argues they should be
excluded from the Court's consideration.  *See id.*  Plaintiff's objection as to these exhibits is also
overruled.  To the extent Plaintiff seeks to strike any exhibits or portions of the University's
motion, such a request has not been properly made, is untimely, and is therefore denied.

> usually constrained to rely on the cumulative weight of circumstantial evidence.

*Bonilla v. Boces*, No. 06-CV-6542, 2010 WL 3488712, at *4 (W.D.N.Y. Sept. 2, 2010) (quoting

*Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991) (internal quotations omitted)).

Here, Plaintiff filed an ODAA Complaint in June 2013 and over the course of the next

year and a half until November 2014, she claims to have been subjected to a campaign to remove

her from teaching.  Although there is no "bright line rule" as to the temporal proximity required

to draw a causal reference, the length of time that passed between the filing of the ODAA

Complaint and the non-renewal decision – a period of 17 months -- is too remote to demonstrate

a causal connection.  *See Thomson v. Odyssey House*, No. 14-CV-3857, 2015 WL 5561209, at

*22 (E.D.N.Y. Sept. 21, 2015); *see also Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110-

11 (2d Cir. 2010) ("Though this Court has not drawn a bright line defining, for the purpose of a

prima facie case, the outer limits beyond which a temporal relationship is too attenuated to

establish causation, we have previously held that *five months is not too long to find the causal*

*relationship*") (emphasis supplied) (citing *Gorman-Bakos v. Cornell Coop. Extension of*

*Schenectady County*, 252 F.3d 545, 554 (2d Cir. 2001)); *see also Behringer v. Lavalle Sch. for*

*the Blind*, No. 08-cv-4899, 2010 U.S. Dist. LEXIS 134440, at *34-*35, 2010 WL 5158644

(S.D.N.Y. Dec. 17, 2010) (finding that allegations of "escalating, negative conduct toward [the

plaintiff] over an eight-month period until an opportunity to fire her presented itself" were

sufficient to make out a prima face case of retaliation); *Monterroso v. Sullivan & Cromwell,*

*LLP*, 591 F. Supp. 2d 567, 583-84 (S.D.N.Y. 2008) (despite ultimately dismissing a retaliation

claim for lack of evidence of pretext, finding that a five-month gap between protected activity

and an adverse employment action was sufficient to make out a prima facie case).

Plaintiff also appears to argue that she engaged in the protected activity of discussing her bipolar disorder with Chairperson Dudley and Professor Rafailovich in requesting their assistance to resolve the problems she was having with Ms. Roy. *See* Pl.'s Opp'n at 19. Although it is not exactly clear from the record when Plaintiff had these conversations with Dudley and Rafailovich, it appears that these exchanges occurred during or shortly after Plaintiff's first summer at the University since that is when Plaintiff testified she began experiencing issues with Ms. Roy. *See* Gentleman Tr. at 66. As such, these conversations appear to have taken place in Summer 2013, which is around the same time that the ODAA Complaint was filed, and are likewise too attenuated to establish causation because they took place more than a year and a half prior to Plaintiff's non-renewal.[5]

Moreover, the Court also finds that the claimed "protected activities" that Plaintiff engaged in do not give rise to a retaliation claim here. *See Natofsky*, 921 F.3d at 354. The Second Circuit has defined "protected activity" as "action taken to protest or oppose statutorily prohibited discrimination." *Id.* As noted by the University, the ODAA Complaint makes no reference to any instance in which Plaintiff was discriminated against on account of her bipolar disorder, but instead includes allegations that she was discriminated against on the basis of gender and subjected to sexual harassment by Professor Trelewicz and Professor Orlov. *See* ODAA Complaint at 13-14. Similarly, although Plaintiff revealed to Chairperson Dudley and

---

[5]     In ruling on Defendants' motion to dismiss the TAC, Judge Spatt held that Plaintiff's allegations, which showed a five-month period of time lapse between Plaintiff's request for a reasonable accommodation and non-renewal of her employment, was not "too long" for purposes of demonstrating a causal connection under the Rehabilitation Act. *See* 6/6/2017 D&O at 9-10. However, the evidence presented to the Court for purposes of the University's summary judgment motion indicates that the length of time between Plaintiff's request for an accommodation and the non-renewal of her appointment was much greater than five months and, thus, too remote to demonstrate a causal connection.

Professor Rafailovich that she suffered from bipolar disorder and sought assistance in her dealings with Ms. Roy, the record does not indicate that Plaintiff sought their help because Ms. Roy was discriminating against her on the basis of her disability.  As such, neither the ODAA Complaint nor the conversations Plaintiff had with Chairperson Dudley and Professor Rafailovich could be construed as acts to protest disability discrimination.

Based on these factors, the University's motion for summary judgment is GRANTED as to Count II of the Third Amended Complaint.

## V.   CONCLUSION

For the foregoing reasons, the University's motion for summary judgment is GRANTED in its entirety.

**SO ORDERED.**

Dated: Central Islip, New York
     March 31, 2021
                                   /s/ A. Kathleen Tomlinson
                                   A. KATHLEEN TOMLINSON
                                   U.S. Magistrate Judge